**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **HALO OPTICAL PRODUCTS, INC. and HALO SPORTS AND SAFETY, INC.,** | **COMPLAINT FOR TRADEMARK INFRINGEMENT, UNFAIR COMPETITION, FALSE ADVERTISING, DILUTION, DECEPTIVE ACTS AND PRACTICES, AND BREACH OF CONTRACT** |
| Plaintiffs, | |
| -against- | |
| **LIBERTY SPORT, INC., f/k/a LIBERTY OPTICAL MANUFACTURING COMPANY, INC.** | **Civil Action No.** 6:14-CV-282 (MAD/TWD) |
| Defendants. | |

## PARTIES

1.      At all times relevant to this complaint, plaintiffs Halo Optical Products, Inc. and Halo Sports and Safety, Inc. (sometimes collectively referred to as "Halo") are, and have been, corporations organized and authorized to do business under the laws of the state of New York, and having a principal place of business at 9 Phair Street, Gloversville, Fulton County, New York 12078.

2.      Upon information and belief, at all times relevant to this complaint, defendant Liberty Sport, Inc., f/k/a Liberty Optical Manufacturing Company, Inc. (sometimes collectively referred to as "Liberty") is, and has been, a corporation organized and authorized to do business under the laws of the state of New Jersey, and presently having its principal place of business at 107 Fairfield Road, Fairfield, New Jersey 07004.

{M0761003.1 }

## JURISDICTION AND VENUE

3.      This is a multiple count action for infringement of a federally registered trademark under the federal trademark or "Lanham" Act of 1946, 15 U.S.C. § 1114(1)(a); for unauthorized use of a term, for false descriptions of origin and for false or misleading descriptions or representations of fact ("unfair competition") under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); for dilution, deceptive business practices and false advertising under New York General Business Law § 360-1, 349 and 350; and for breach of contract under common law. Jurisdiction is conferred on this court under 15 U.S.C. § 1125(a) (1) (false advertising) and 28 U.S.C. §§ 1331 (federal question), 1338(a) (trademark infringement) and 1338(b) (unfair competition).

4.      With respect to the non-federal claims, this court has original and ancillary jurisdiction under 28 U.S.C. §§ 1338(b) and 1332(a).

5.      Venue in this district is proper under 28 U.S.C. § 1391(b) as substantial parts of the events giving rise to the claims in this action occurred within this district.

## FACTS COMMON TO ALL COUNTS

6.      Halo Optical Products, Inc. was incorporated in the state of New York in 1964.

7.      In September, 1978, Peter Leonardi and Jerome Segal acquired all of the stock of Halo Optical Products, Inc. the primary business of which, at that time, was the manufacture or sale of traditional eyeglasses.

8.      In January, 1979, Peter Leonardi, who had repeatedly broken his partner's eyeglasses while playing racquetball, decided to design and market a new kind of eyewear to protect the eyes of participants in sporting activities, such as racquetball, lacrosse, basketball,

field hockey and soccer, from injuries that might result from being struck by a ball, another participant's elbow, a racquet or other such danger.

9.      Such eyewear, manufactured or sold by Halo since 1979, consists of a frame made of various plastics (such as propionate, nylon and soft padding) which can be fitted with either prescription or non-prescription lenses ("RXable" or "Plano").  The frames so manufactured by or for Halo, which are the subject of this lawsuit, will be referred to as "sports protective eyewear."

10.     In March 1981, Halo filed an application with the U.S. Patent and Trademark Office for a U.S. Trademark – "REC SPECS" – for its sports protective eyewear.

11.     In February 1982, Halo received a United States trademark registration (Registration No. 1188522), for the use of the trademark "REC SPECS" for its sports protective eyewear (sometimes hereafter referred to as Halo's U.S. "registered trademark").  Halo later received a Canadian trademark [Registration number TMA631509], also for the trademark "REC SPECS," for its sports protective eyewear.

12.     All RXable sports protective eyewear manufactured by or on behalf of Halo is sold in the optical market (i.e., through opticians, optometrists, ophthalmologists and other eye health professionals) under Halo's REC SPECS trademark.

13.     The REC SPECS branded sports protective eyewear for which Halo sought and obtained such trademark protection has met, and is advertised and promoted as meeting, American Society for Testing and Materials ("ASTM") standard F803, signifying that it meets that standard for impact resistance.

14.     The ASTM F803 standard, amended and updated from time to time, includes a detailed procedure to test the eyewear to ensure that it provides the requisite protection for the

wearer's eyes, is properly labeled and satisfies the American National Standards Institute ("ANSI") Z80 lens/optical quality requirements.

15.     Meeting the ASTM F803 standard is a critical feature of the REC SPECS eyewear, both in terms of their safety and functionality and, as a result, their desirability and marketability to consumers.  In fact, some sports (including squash, racquetball, women's field hockey and women's lacrosse) require ASTM F803 certification for the eye protection worn by participants.

16.     For over 30 years, as a result of their quality and ASTM F803 certification, extensive sales and promotion throughout the U.S., and the endorsement and wearing of REC SPECS eyewear by such professional athletes as Eric Dickerson, Horace Grant and Chris Sabo, REC SPECS eyewear have enjoyed a predominant position in the market place (having been on the cover of Sports Illustrated more than half a dozen times), enhanced and protected by Halo's REC SPEC trademarks, with the result that consumers routinely ask for them by name and think of REC SPECS eyewear as synonymous with sports protective eyewear.

17.     In or about 1983, after Halo had both applied for – and received – its U.S. REC SPECS trademark, it entered into an oral agreement with Liberty under which it appointed Liberty as the exclusive wholesale distributor of REC SPECS eyewear.  Halo had previously distributed REC SPECS eyewear, on a non-exclusive basis, through other distributors.

18.     Officers and agents of Liberty (then known as Liberty Optical Manufacturing Company, Inc., a company which, until then, had also focused its business on the manufacture and distribution of traditional eyeglasses), traveled to Halo's place of business in Fulton County to seek Halo's appointment as the exclusive wholesale distributor of REC SPECS eyewear.

19.     In 1985, two years after Halo appointed Liberty as the exclusive wholesale distributor of REC SPECS eyewear, Peter Leonardi bought Jerome Segal's interest in Halo Optical Products, Inc. and incorporated Halo Sports and Safety, Inc. (of which he has at all times been sole shareholder), also under the laws of the state of New York and having the same place of business as Halo Optical Products, Inc., to conduct Halo's sports protective eyewear business.

20.     Since Halo appointed Liberty the exclusive distributor of REC SPECS eyewear, Liberty has distributed hundreds of thousands of units of REC SPECS eyewear – as well as other products – in this judicial district and elsewhere in New York.

21.     Since Halo appointed Liberty the exclusive distributor of REC SPECS eyewear, officers and agents of Liberty traveled to Fulton County, sometimes as often as once a week, in connection with Liberty's marketing and sale of REC SPECS eyewear.

22.     In January 1992, Halo and Liberty entered into a written agreement (the "1992 Distribution Agreement") which provided, *inter alia*, that Liberty would continue to be the exclusive distributor of all REC SPECS eyewear, that Halo would continue to make eyewear for distribution by Liberty and that, although the agreement was to be "ongoing with no specific terms" (but could be terminated at any time in 12 months' written notice), Liberty would have no rights in the name REC SPECS.

23.     In August 1993, Halo and Liberty entered into another written agreement (the "1993 Trademark License Agreement") which specified, *inter alia*, that all sports protective eyewear distributed by Liberty would be marketed under Halo's REC SPECS trademark, that Liberty would have the exclusive license to use Halo's REC SPECS trademark, and that (absent a further agreement between Halo and Liberty) Liberty would not market other sports protective eyewear which would compete with REC SPECS eyewear.  The 1993 Trademark License

Agreement also provided that Liberty would have a right to purchase Halo (and thereby its REC

SPECS trademarks) either from Peter Leonardi (if he decided to sell Halo during his lifetime) or

his estate (if he had not sold Halo during his lifetime).

      24.     In 1995 Liberty rented a warehouse and an apartment in Fulton County, in

connection with Liberty's distribution and marketing of REC SPECS eyewear and its vice

president's frequent related visits to Halo's offices.

      25.     From the inception of its relationship with Liberty (in 1983) until 2003, Halo

would either manufacture its REC SPECS eyewear in Fulton County or have them manufactured

by other U.S. manufacturers and shipped to it in Fulton County.

      26.     In 2003 Halo started to have some of its REC SPECS eyewear manufactured in

Taiwan, either by Hwa Meei Optical Co., Ltd., or another manufacturer located there (hereinafter

"Halo's Taiwanese manufacturer").  Since 2009, Halo has had all of its REC SPECS eyewear

manufactured in Taiwan.

      27.     At all times from 1983 until the events in 2014 giving rise to this litigation, and

whether the REC SPECS were manufactured by Halo or by its  U.S. or Taiwanese

manufacturers, the consistent, 30-year-long practice of Liberty, Halo and Halo's manufacturers

has been as follows:

- Liberty places an order with Halo.

- Halo either manufactures the product itself or places an order with its U.S. or Taiwanese manufacturers to have the product made by that manufacturer.

- If the product is made by Halo's U.S. or Taiwanese manufacturers, the manufacturer ships the product to Halo, invoices Halo for the product and Halo pays the manufacturer's invoice.

- Halo inspects, tests and certifies the product (as described below), ships the product to Liberty, invoices Liberty and Liberty pays Halo's invoice.  The price paid by Liberty is as set forth on Halo's price list which price includes an agreed

upon mark-up of Halo's cost of acquiring the product (of either manufacturing the product itself or purchasing them from its U.S. or Taiwanese manufacturers) as compensation for Halo's inspection and quality control of the product and for Liberty's use of Halo's REC SPECS trademark.

- On a very few occasions when Liberty needed product on an expedited basis to fulfill a time-sensitive order placed by one of its customers, Halo's Taiwanese manufacturer would ship the order to Liberty and Liberty would then ship random product from the order to Halo for the same inspection, testing and certification by Halo.

28.    At all times from 1983 until the events in 2014 giving rise to this litigation, and whether the product was manufactured by Halo itself or for Halo by its U.S. or Taiwanese manufacturers, before Halo sold, invoiced and shipped the product to Liberty, it inspected each and every unit of the REC SPECS eyewear to ensure that there were no blemishes or defects, that the strap was attached properly, that the lens was not scratched, that the nose pads and side pads (if any) were properly attached to the frame and that the sports protective eyewear had been properly assembled and labeled.  Halo at all times since 1983, and whether the product was manufactured by Halo itself or by its U.S. or Taiwanese manufacturers, also subjected random samples of the product to destructive testing to ensure that they met the ASTM F803 standard. As part of this testing, Halo's employees placed the REC SPECS eyewear in question on a model (like a "crash test dummy") on the eyeballs of which a disclosing material has been placed. Halo's employees then used an air cannon to shoot a ball at the model's REC SPECS eyewear to ensure that the frame did not fracture and that no part of the REC SPECS eyewear, including the lens, made contact with the model's eyeballs.  Only after Halo's employees had subjected the product to such inspection did Halo then approve, ship, invoice and sell the product to Liberty.

29.    Halo's practice of inspecting, testing and certifying its REC SPECS eyewear became even more important after it began to use a Taiwanese manufacturer (as Halo then had less direct control over the quality of the manufacturing process than it did when it initially

manufactured the REC SPECS eyewear itself or later when it had them manufactured for it by another U.S. manufacturer).  To protect its trademark, the reputation of its REC SPECS eyewear, and the eyes of its ultimate consumers -- both children and adults -- it became even more critical for Halo to ensure that its REC SPECS eyewear continued to meet the same high quality -- and safety -- standards it had established when it first trademarked REC SPECS eyewear in 1982. Halo's inspection of the REC SPECS eyewear manufactured for it in Taiwan was not a marketing device; those inspections have repeatedly and regularly resulted in rejections of, or the need for adjustment to, the REC SPECS eyewear (such as Halo's employees having to securely re-glue the nosepieces in the correct location to protect the wearer's eyes and nose).

30.     In April 2003 Halo and Liberty entered into another written agreement entitled "licensing agreement for recspecs.com" (the "2003 recspecs.com Domain Name Licensing Agreement") under which Halo, as the owner of that domain name, licensed Liberty, to use that domain name, with various restrictions and provisions including: a) that Halo had the right to approve all information, or products sold, under that domain name, b) that no non-REC SPECS products would be advertised or sold on that website, and c) that the agreement did not in any way lessen Halo's ownership of recspecs.com or constitute any ownership by Liberty of the REC SPECS domain name.

31.     In December 2004, more than 20 years after Halo had appointed it as exclusive distributor of Halo's REC SPECS eyewear, Liberty changed its name from Liberty Optical Manufacturing Company, Inc. to Liberty Sport, Inc.

32.     Between 2004 and early 2006 Halo and Liberty attempted to negotiate a single new agreement to provide for Liberty's immediate purchase of Halo and to replace their various existing agreements.  They were ultimately unsuccessful in those efforts and, instead, kept their

existing agreements in place while entering into various additional agreements, some described

below, governing their business relationship.

33.     In 2005, Halo and Liberty entered into an Outline of Understanding ("the 2005

Outline of Understanding"),  under which Halo would provide consulting services to Liberty on

protective sun-wear (a line of products, not the subject of this litigation, not meeting the ASTM

803 standard and not using the REC SPECS trademark).  The 2005 Outline of Understanding

provided for its unilateral termination, by either party, on 60 days' notice.

34.     In September 2006, Liberty and Halo entered into a Memorandum of

Understanding ("the 2006 Memorandum of Understanding"), under which the parties agreed,

*inter alia*, that:

> [g]iven the strong support by Wal-Mart to REC SPECS, Liberty and HALO
> recognize the need to diversify the marketing of the F803 product [sport
> protective eyewear meeting the ASTM F803 standard].  Therefore the parties
> agree that Liberty will market other F803 product that will not be marked REC
> SPECS but which will continue to be ordered through HALO per the current
> agreements. HALO will continue to receive all PO's [purchase orders] for this
> product and HALO will bill and process the PO's and will test and certify this
> product consistent with current practice.  HALO will use the current agreed upon
> mark-up margins (34%) for these products.

The 2006 Memorandum of Understanding, unlike the 2005 Outline of Understanding, did not

provide for unilateral termination (either on 60 days' notice or otherwise) by either party.

35.     Under the parties' 2006 Memorandum of Understanding, Liberty then began to

order, through Halo, a new line of "F803" sports protective eyewear (marketed as Liberty's "F8"

collection) which, although it met (and was advertised as meeting) the ASTM F803 standard,

was not marketed as REC SPECS eyewear.  However, as they had since 1983, and as they agreed

in their 2006 Memorandum of Understanding, Halo and Liberty continued to process orders for

(and Halo continued to receive all purchase orders, and to test and certify) the new F803

products (with the agreed upon mark-up over Halo's cost of acquisition) just as they had for the

preceding 23 years with the sports protective eyewear had been expressly, and solely, marketed as REC SPECS eyewear.

36.    On or about October 25, 2013, at a meeting requested by Liberty's president, he told Peter Leonardi that Liberty's business had changed, that Liberty felt it was paying too much (for Halo's inspection, testing and certification and Liberty's use of Halo's U.S. and Canadian REC SPECS trademarks) and that Liberty wanted to negotiate a new contractual relationship with Halo (before Peter Leonardi had either decided to sell Halo or had passed on).  At the October 25, 2013 meeting, Liberty's president gave Peter Leonardi a letter (bearing that date) in a sealed envelope, in which he (Liberty's president) stated that, effective as of December 31, 2013, Liberty was purporting to terminate both the parties' 2005 Outline of Understanding and their 2006 Memorandum of Understanding (while expressly stating that their 1993 Trademark Licensing Agreement would remain in effect -- and making no mention of their 1992 Distribution Agreement or their 2003 recspecs.com Domain Name Licensing Agreement).

37.    On or about November 13, 2013, Halo received a letter from Liberty "reconfirm[ing] that Liberty intends to fully comply with all provisions of the August 13, 1993 [Trademark Licensing] Agreement, including marketing all Liberty Sports protective eyewear under the REC SPEC trademark".

38.    However, contrary to the parties' 1993 Trademark Licensing Agreement and Liberty's 2013 assurance that it would comply with all provisions of that agreement, and also contrary to the parties' 2003 recspecs.com Domain Name Licensing Agreement, upon information and belief, since January 1, 2014, Liberty has been marketing sports protective eyewear (on the recspecs.com and other websites) as meeting the ASTM F803 standard (i.e.,

Liberty's "F8" line created under the 2006 Memorandum of Understanding as well as a new

"SPORTS SPEC" line) which competes with REC SPECS eyewear.

39.     For instance, since January 1, 2014 Liberty's website blurs beyond recognition

the distinction between Halo's REC SPECS and Liberty's F803 products.  Whether one searches

for "Liberty Sport," "REC SPECS" or "recspecs.com," one is directed, inter alia, to

www.recspecs.com or www.libertysport.com which demonstrate that Liberty continues to

market sports protective eyewear that both competes with REC SPECS and conflates REC

SPECS with Liberty's F8 collection.  If one goes to www.recspecs.com one is taken directly to

Liberty's (www.libertysport.com) website.  The first page of Liberty's website refers to "REC

SPECS" (and the ASTM F803 standard they meet), but contains no reference to Liberty's F8

collection.  When one then clicks on "EYEWEAR," there is listed only REC SPECS, "Youth

Protective," "Sun Performance," "Switch Interchange" and "Accessories" but, again, no mention

of Liberty's F8 collection.  It is only when one again clicks on "REC SPECS" and then "ALL

BRANDS" that one finally sees a reference, with REC SPECS, to F8.  However, when one

clicks on "F8", one sees Liberty's circular answer to its rhetorical question -- "What is protective

eyewear?":

> "REC SPECS
>
> Our frames and lenses are specifically designed to protect against impact and are
> tested to meet or exceed the strictest ASTM F803 standards. They're also
> engineered to handle any prescription.  So you get comfortable, durable protection
> without sacrificing sight or style."

Even when one clicks on a specific "F8" model, one again sees references back to Halo's

REC SPECS trademark (e.g., "REC SPECS -- BETTY" [with the abbreviation "RS"

prominently displayed on the outside of the eyewear] or to F8 as a kind of REC SPECS

eyewear (e.g., "REC SPECS -- F8 COLLECTION -- MORPHEUS I").

40.     Furthermore, upon information and belief, since sometime in 2014, Liberty has also been ordering (from Halo's Taiwanese manufacturer) and marketing (to Liberty's customers) sports protective eyewear (whether marketed as REC SPECS eyewear or the F8 COLLECTION of REC SPECS eyewear) which is no longer being sold or shipped to Halo for it to perform the inspection, certification and testing it had performed on such products for the preceding 30 years. For instance, in February 2014, Halo received from its Taiwanese manufacturer a shipping document concerning a January 2014 shipment of 33 cartons of product (including REC SPECS eyewear) – a shipment not ordered by Halo – direct to Liberty. Then, two days later, Halo was told by its Taiwanese manufacturer to disregard that shipping document.

41.     From past experience Halo has learned that, in an effort to save money and cut costs, neither its Taiwanese manufacturer nor Liberty subject the sports protective eyewear they manufacture and sell to the same quality control standards, or the same ASTM F803 destructive testing, as Halo does. As a result, absent Halo's inspection, testing and certification, the safety of the consuming public, and Halo's ability to protect and control the reputation for quality it has worked so hard to develop and maintain will be irreparably damaged.

42.     Although Halo has attempted to address with Liberty its ordering of REC SPECS eyewear directly from Halo's Taiwanese manufacturer, Liberty has taken the position that it is free to do so and then market such sports protective eyewear to Liberty's customers as REC SPECS eyewear without buying them from (or having them sent to or inspected, tested or certified by) Halo and without paying Halo the agreed upon mark-up (indeed, without paying Halo anything) on the cost of acquiring the eyewear. At the same time Liberty has sought to negotiate a new business arrangement with Halo (i.e., to renegotiate the parties' written

agreements, as implemented by their course of conduct and practice of the last 30 years). For instance, although by their 1993 Trademark Licensing Agreement the parties have already negotiated a method for Liberty to purchase Halo (and, thus, its REC SPECS trademarks) from Peter Leonardi's estate (or from Peter Leonardi should he want to sell Halo during his lifetime), Liberty now seeks to bypass that agreement and purchase Halo immediately.

43.     As a result of Liberty's actions in:  a) selling sports protective eyewear (under Halo's REC SPECS trademark) which has not been purchased from, or inspected, tested or certified by Halo (in violation of the parties' 30 years of agreements and course of conduct and practice implementing them) and b) selling non-REC SPECS sports protective eyewear which competes with REC SPECS eyewear, Liberty has infringed Halo's trademark, violated its agreements with Halo and  caused confusion in the minds of Liberty's and Halo's consumers and the public as to the source, origin and quality of the sports protective eyewear now marketed and sold by Liberty.

## COUNT I – FEDERAL TRADEMARK INFRINGEMENT

44.     Plaintiffs hereby re-allege, as if fully set forth, the allegations of paragraphs 1-43.

45.     Defendant's unauthorized use of plaintiffs' registered trademark, either exactly or in the form of colorable imitations, is likely to cause confusion, to cause mistake, or to deceive.

46.     Upon information and belief, defendant's unauthorized use of plaintiffs' registered trademark is willful and has caused confusion, mistake or deception.

47.     Defendant's actions constitute unauthorized use in commerce of plaintiffs' registered trademark, which is likely to cause confusion, mistake or deception, in violation of 15 U.S.C. § 1141(1)(a), and is causing plaintiffs damages and irreparable harm.

## COUNT II – FEDERAL UNFAIR COMPETITION

48.     Plaintiffs hereby re-allege, as if fully set forth, the allegations of paragraphs 1-43.

49.     The foregoing acts of defendant, in identifying its goods and services with plaintiffs' registered trademark, damage the goodwill established by plaintiffs in their registered trademark.  Defendant's acts constitute false designations of origin and false or misleading descriptions or representations of fact, which tend to cause (and which have caused) confusion, mistake, or deception, as to the affiliation, connection, or association of defendant with plaintiffs, or as to the origin, sponsorship, or approval of plaintiffs' sport protective eyewear (and related products of defendant) in violation of 15 U.S.C. § 1125(1)(A).

50.     The foregoing acts of defendant are willful and are causing plaintiffs damages and irreparable harm.

## COUNT III – BREACH OF CONTRACT

51.     Plaintiffs hereby re-allege, as if fully set forth, the allegations of paragraphs 1-43.

52.     The foregoing acts of defendant, including but not limited to its failure to continue to order REC SPECS eyewear from plaintiffs, and to pay for and allow for plaintiffs' inspection, testing and certification of same and to pay for the use of plaintiffs' registered trademark, and defendant's sale of REC SPECS eyewear contrary to the parties' agreements, and the parties' custom and practice implementing those agreements, constitute willful breach of those agreements, which breach has caused damage and irreparable harm to plaintiffs.

## COUNT IV – BREACH OF CONTRACT

53.     Plaintiffs hereby re-allege, as if fully set forth, the allegations of paragraphs 1-43.

54.     The foregoing acts of defendant, in selling sport protective eyewear, which competes with REC SPECS eyewear, other than in compliance with the parties' 1993 Trademark

License Agreement, constitute a willful breach of that agreement which breach has caused damage and irreparable harm to plaintiffs.

<u>**COUNT V – BREACH OF CONTRACT**</u>

55.     Plaintiffs hereby re-allege, as if fully set forth the allegations of paragraphs 1-43.

56.     The foregoing acts of defendant, in selling "F803" products including its F8 COLLECTION and its "SPORTS SPECS" which compete with REC SPECS eyewear (without having such products inspected, tested and certified by plaintiffs and without paying plaintiffs the agreed upon mark-up of the cost of acquisition of such products), constitute a violation of the parties' 1993 Trademark License Agreement (and its provision that defendant would not, without plaintiffs' agreement, sell sports protective eyewear which compete with REC SPECS eyewear) and the parties' 2006 Memorandum of Understanding (and its provisions that defendant would continue to order F803 product through plaintiffs per the parties' then-current agreements, that plaintiffs would continue to receive all purchase orders for such products, that plaintiffs would fill and process all such purchase orders and that plaintiffs would test and certify such product consistent with the parties' then current practice) and constitutes a willful breach thereof, which breach has caused damage and irreparable harm to plaintiffs.

<u>**COUNT VI – DECEPTIVE ACTS AND PRACTICES,
FALSE ADVERTISING, INJURY TO
BUSINESS REPUTATION AND DILUTION –
GENERAL BUSINESS LAW 349, 350 and 350-l**</u>

57.     Plaintiffs hereby re-allege, as if fully set forth, the allegations of paragraphs 1-43.

58.     The foregoing acts of defendant, including the dilution of the distinctive quality of Halo's REC SPECS trademark, the representations or suggestions that defendant is associated with plaintiffs, and authorized to sell what is held out as being REC SPECS eyewear (or the F8 COLLECTION of REC SPECS) meeting the quality and safety standards established by

plaintiffs over the past 30+ years, and defendant's advertising, which conflates Halo's REC

SPECS eyewear and defendant's ASTM F803 products, constitute deceptive or misleading acts

and practices, false advertising, injury to business reputation and dilution which were intended to

confuse, and did confuse, consumers as to the relationship between plaintiffs and defendant, all

causing damage and irreparable harm to plaintiffs.

## PRAYER FOR RELIEF

WHEREAS, plaintiffs ask:

a.   That defendant, and any other persons acting in concert with defendant, be

preliminarily and permanently enjoined and restrained:

i.   from using plaintiffs' registered trademark REC SPECS (or any confusingly

similar designation, alone or in combination with any other term or as part of

a logo, in connection with defendant's goods or services) other than on sports

protective eyewear ordered through (and inspected, tested and certified by)

plaintiffs in accordance with the parties' 30+ years of agreements and custom

and practice implementing them;

ii.   from selling or marketing any sports protective eyewear (including but not

limited to defendant's F8 COLLECTION or SPORTS SPECS) which compete

with REC SPECS eyewear other than in accordance with the parties' 2006

Memorandum of Understanding;

iii.   from performing any actions or using the trademark REC SPECS or any

words, names, styles, titles or marks which are likely to cause confusion, to

cause mistake or to deceive, or to otherwise mislead the trade or public into

believing that plaintiffs and defendant are one and the same or are in some

way connected, or that plaintiffs are a sponsor of defendant, or that defendant is in some manner affiliated or associated with or under the supervision or control of plaintiffs, or that defendant's goods or services originate with plaintiffs or are conducted or offered with the approval, consent or authorization of plaintiffs, or under the supervision of plaintiffs, or are likely in any way to lead the trade or the public to associate defendant's F803 products (including its F8 COLLECTION or SPORTS SPECS) with plaintiffs' REC SPECS branded sport protective eyewear.

iv. From using any trade practices whatsoever, including those complained of herein, which tend to unfairly compete with or injure plaintiffs' business and the goodwill appertaining thereto;

b.  That the defendant be ordered:

i.  to deliver up for destruction all marketing materials, advertisements, brochures, catalogs, promotional materials, and any and all other items which bear or use plaintiffs' registered trademark, or any colorable imitations thereof, or any other name, term and/or logo or design confusingly similar to plaintiffs' registered trademark, together with all plates, molds, computer disks, and other means and materials for making or reproduction any such mark;

ii. to notify defendant's customers that the defendant's currently marketed and sold sports protective eyewear is in no way connected with REC SPECS eyewear; and

iii. to file with the court and serve plaintiffs, within 30 days after the date of any injunction, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction;

c.    that defendant be held to specific performance of its agreements with plaintiffs, in accordance with the parties' 30+ years of custom and practice implementing them, absent which defendant shall immediately cease using plaintiffs' registered trademark;

d.    that judgment be rendered against defendant:

i. for all profits received by defendant and all damages sustained by plaintiffs on account of defendant's actions; and, furthermore, that such profits and damages be trebled, if appropriate;

ii. for punitive damages, if appropriate, in the amount of Five Million Dollars ($5,000,000) by reason of defendant's willful and tortious acts complained of herein;

e.    that plaintiffs receive their costs in this action, including an award of their reasonable attorneys' fees, if appropriate; and

f.    that the court grant such other and further relief as it shall deem just.

Albany, New York
March 13, 2014

McNAMEE, LOCHNER, TITUS & WILLIAMS, P.C.

BY:  s/G. Kimball Williams
       G. Kimball Williams (Bar Roll No. 102827)
       *Attorneys for Plaintiffs*
       677 Broadway
       Albany, New York 12207
       518-447-3200