**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**HALO OPTICAL PRODUCTS, INC. and HALO**
**SPORTS AND SAFETY, INC.,**

                             **Plaintiffs/Counter Defendants,**

      **vs.**                                      **6:14-cv-282**
                                                **(MAD/TWD)**

**LIBERTY SPORTS, INC.,** _formerly known as_
**LIBERTY OPTICAL MANUFACTURING**
**COMPANY, INC.,**

                             **Defendant/Counter Claimant.**
_____

| | |
|---|---|
| **APPEARANCES:** | **OF COUNSEL:** |
| **MCNAMEE, LOCHNER, TITUS &** **WILLIAMS, P.C.** | **G. KIMBALL WILLIAMS, ESQ.** |
| 677 Broadway | |
| Albany, New York 12207-2503 | |
| Attorneys for Plaintiffs/Counter Defendants | |
| **LERNER, DAVID, LITTENBERG,** **KRUMHOLZ & MENTLIK, LLP** | **GREGG A. PARADISE, ESQ.** **RAYMOND B. CHURCHILL, JR., ESQ.** |
| 600 South Avenue West | **ROBERT B. HANDER, ESQ.** |
| Westfield, New Jersey 07090 | |
| Attorneys for Defendant/Counter Claimant | |
| **O'CONNELL & ARONOWITZ, P.C.** | **JEFFREY J. SHERRIN, ESQ.** |
| 54 State Street | |
| 9th Floor | |
| Albany, New York 12207 | |
| Attorneys for Defendant/Counter Claimant | |

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

# I. INTRODUCTION

Plaintiffs Halo Optical Products, Inc. and Halo Sports and Safety, Inc. (hereinafter collectively referred to as "Halo") commenced this suit on March 13, 2014, alleging trademark infringement and breach of contract by Defendant Liberty Sports, Inc (hereinafter "Liberty"). *See generally* Dkt. No. 1. Specifically, Halo alleges the following causes of action: (1) Federal Trademark Infringement pursuant to 15 U.S.C. § 1141(1)(a); (2) Federal Unfair Competition pursuant to 15 U.S.C. § 1125(1)(A); (3) a breach of contract claim regarding Liberty's failure to "order REC SPECS eyewear from plaintiffs, and to pay for and allow for plaintiffs' inspection, testing and certification of same and to pay for the use of plaintiffs' registered trademark, and defendant's sale of REC SPECS eyewear contrary to the parties' agreements, and the parties' custom and practice implementing those agreements[;]" (4) a breach of contract claim regarding Liberty's alleged breach of the parties' 1993 Trademark License Agreement; (5) a breach of contract claim regarding Liberty's "selling 'F803' products including its F8 COLLECTION and its 'SPORTS SPECS' which compete with REC SPECS eyewear (without having such products inspected, tested and certified by plaintiffs and without paying plaintiffs the agreed upon mark-up of the cost of acquisition of such products) . . ." which constitutes a violation of the parties' 1993 Trademark License Agreement and the parties' 2006 Memorandum of Understanding; and (6) Deceptive Acts and Practices, False Advertising, Injury to Business Reputation and Dilution claims pursuant to New York General Business Law sections 349, 350, and 350-I.

That same day, Halo filed a motion for preliminary injunction. *See* Dkt. No. 5. On May 28, 2014, the Court held oral argument on Halo's motion.

Currently before the Court is Plaintiffs' motion for preliminary injunctive relief. *See* Dkt. No. 5.

## II. BACKGROUND

Halo Optical Products, Inc. and Halo Sports and Safety, Inc. (hereinafter collectively referred to as "Halo"), are corporations organized under the laws of the state of New York.  *See* Dkt. No. 1 at ¶ 1.  Defendant Liberty Sport, Inc. (hereinafter "Liberty") is a corporation organized under the laws of the state of New Jersey.  *See id.* at ¶ 2.

Plaintiff Halo was incorporated in the state of New York in 1964.  *See id.* at ¶ 6.  In September of 1978, Peter Leonardi and Jerome Segal acquired all of the stock of Plaintiff Halo, the primary business of which at the time was the manufacture or sale of traditional eyeglasses.  *See id.* at ¶ 7.  In January of 1979, Mr. Leonardi, who had repeatedly broken is partner's eyeglasses while playing racquetball, decided to design and market a new kind of eyewear to protect the eyes of participants in sporting activities, such as racquetball, lacrosse, basketball, field hockey and soccer.  *see id.* at ¶ 8.  Such eyewear, manufactured or sold by Halo since 1979, consists of a frame made of various plastics (such as propionate, nylon and soft padding) which can be fitted with either prescription or non-prescription lenses ("Rxable" or "Plano").  *See id.* at ¶ 9.  These frames manufactured by or for Halo, which are the subject of this lawsuit, will be referred to as "sports protective eyewear."

In March of 1981, Plaintiff Halo filed an application with the United States Patent and Trademark Office for the trademark "REC SPECS" for its protective eyewear.  *See id.* at ¶ 10.  In February of 1982, Halo received a trademark registration (Registration No. 1188522) for use of the trademark "REC SPECS."  *See id.* at ¶ 11.  Halo later received a Canadian trademark for "REC SPECS."  *See id.*  All Rxable sports protective eyewear manufactured by or on behalf of Halo is sold in the optical market under Halo's REC SPECS trademark.  *See id.* at ¶ 12.

The REC SPECS branded sports protective eyewear for which Halo sought and obtained trademark protection has met, and is advertised and promoted as meeting, the American Society for Testing and Materials ("ASTM") standard F803, signifying that it meets that standard for impact resistance. *See id.* at ¶ 13. The ASTM F803 standard, amended and updated from time to time, includes a detailed procedure to test the eyewear to ensure that it provides the requisite protection for the wearer's eyes, is properly labeled and satisfies the American National Standards Institute ("ANSI") Z80 lens/optical quality requirements. *See id.* at ¶ 14. Plaintiff Halo claims that "[m]eeting the ASTM F803 standard is a critical feature of the REC SPECS eyewear, both in terms of their safety and functionality and, as a result, their desirability and marketability to consumers. In fact, some sports (including squash, racquetball, women's field hockey and women's lacrosse) require ASTM F803 certification for the eye protection worn by participants." *Id.* at ¶ 15. As a result of their quality and the ASTM F803 certification, sales and promotion throughout the United States, Plaintiff claims that "REC SPECS eyewear have enjoyed a predominant position in the market place . . . with the result that consumers routinely ask for them by name and think of REC SPECS eyewear as synonymous with sports protective eyewear." *Id.* at ¶ 16.

In 1983, after Plaintiff had applied for and received its United States REC SPECS trademark, it entered into an oral agreement with Defendant under which it appointed Defendant as the exclusive wholesale distributor of REC SPECS eyewear. *See id.* at ¶ 17. Plaintiff had previously distributed its REC SPECS eyewear, on a non-exclusive basis, through other distributors. *See id.* Since Plaintiff appointed Defendant the exclusive distributor of REC SPECS eyewear, Defendant has distributed hundreds of thousands of units of REC SPECS eyewear. *See id.* at ¶ 20.

On January 27, 1992, Plaintiff and Defendant entered into a written agreement (the "1992 Distribution Agreement"), which provided, among other things, that Halo agrees "to continue to manufacture high quality sports-safety eyewear products . . . for distribution by Liberty" and that "Liberty agrees to continue to be the exclusive distributor for those Halo safety-eyewear products currently carried by Liberty[.]" Dkt. No. 5-6 at 2. The 1992 Distribution Agreement further provided that either party could terminate the agreement "at anytime for any reason providing the terminating party give the other party twelve (12) months written notice of its desire to terminate." *Id.* Moreover, the agreement gave Liberty the option to purchase Halo should Halo's majority shareholder desire to sell his or her majority interest or desire to cease doing business. *See id.* at 3. Finally, the 1992 Distribution Agreement stated that "Liberty shall acquire no rights to the name 'REC SPECS' by virtue of its distribution of products supplied by HALO." *Id.*

In August of 1993, Halo and Liberty entered into another written agreement (the "1993 Trademark License Agreement"). This agreement provided as follows:

> Now, therefore in consideration of One dollar (1.00) to each in hand paid, receipt of which is hereby acknowledged and other good and valuable consideration and the mutual covenants and agreements herein contained, the parties do mutually covenant and agree as follows:
>
> 1. All Liberty Sports protective eyewear will be marketed under the REC SPEC trademark, with the exception of any new brand name labels acquired by Liberty.
>
> 2. Liberty has the exclusive right to REC SPECS trademark name so long as Liberty continues to aggressively market and promote said trademark. Liberty agrees not to market other sports protective eyewear which would compete against REC SPECS unless agreed to between the parties.

Dkt. No. 5-7 at 2. The 1993 Trademark License Agreement also provided that Liberty would have the right to purchase Halo (and thereby its REC SPECS trademarks) either from Peter

Leonardi, if he decided to sell Halo during his lifetime, or from his estate, if he still owned Halo at the time of his death. *See id.* at 3.

From the inception of its relationship with Liberty until 2003, Halo would either manufacture its REC SPECS eyewear in Fulton County or have them manufactured by other U.S. manufacturers and then shipped to Halo in Fulton County. *See* Dkt. No. 1 at ¶ 25. In 2003, Halo started to have some of its REC SPECS eyewear manufactured in Taiwan. *See id.* at ¶ 26. Since 2009, Halo has had all of its REC SPECS eyewear manufactured in Taiwan. *See id.*

According to the complaint, at all times from 1983 until the events in 2014 giving rise to this litigation, and regardless of whether the REC SPECS were manufactured by Halo or by its U.S. or Taiwanese manufacturers, the consistent practice of the parties was as follows:

> Liberty places an order with Halo.
>
> Halo either manufactures the product itself or places an order with its U.S. or Taiwanese manufacturers to have the product made by that manufacturer.
>
> If the product is made by Halo's U.S. or Taiwanese manufacturers, the manufacturer ships the product to Halo, invoices Halo for the product and Halo pays the manufacturer's invoice.
>
> Halo inspects, tests and certifies the product (as described below), ships the product to Liberty, invoices Liberty and Liberty pays Halo's invoice. The price paid by Liberty is as set forth on Halo's price list which price includes an agreed upon mark-up of Halo's cost of acquiring the product (of either manufacturing the product itself or purchasing them from its U.S. or Taiwanese manufacturers) as compensation for Halo's inspection and quality control of the product and for Liberty's use of Halo's REC SPECS trademark.
>
> On a very few occasions when Liberty needed product on an expedited basis to fulfill a time-sensitive order placed by one of its customers, Halo's Taiwanese manufacturer would ship the order to Liberty and Liberty would then ship random product from the order to Halo for the same inspection, testing and certification by Halo.

*Id.* at ¶ 27.

Moreover, Halo contends that at all times from 1983 until the events in 2014 giving rise to this litigation, and regardless of whether the product was manufactured by Halo or one of its manufacturers, before Halo sold, invoiced and shipped the product to Liberty, it inspected each and every unit of the REC SPECS eyewear to ensure that there were no blemishes or defects, that the strap was attached properly, that the lens was not scratched, that the nose pads and side pads (if any) were properly attached to the frame, and that the sports protective eyewear had been properly assembled and labeled. *See id.* at ¶ 28. Moreover, Halo claims that, at all times since 1983, it also subjected random samples of the product "to destructive testing to ensure that they met the ASTM F803 standard." *Id.* Halo contends that its practice of inspecting, testing, and certifying its REC SPECS eyewear became even more important after it began to use a Taiwanese manufacturer since Halo then had even less control over the quality of the manufacturing process than it did when it initially manufactured the REC SPECS eyewear itself or later when it had them manufactured for it by another manufacturer in the United States. *See id.* at ¶ 29.

In April of 2003, Halo and Liberty entered into another written agreement entitled "LICENSING AGREEMENT FOR recspecs.com." Dkt. No. 5-8 at 2. Pursuant to this agreement, Halo, as the owner of the domain name, licensed Liberty to use that domain name, with various restrictions and provisions, including: (1) that Halo had the right to approve all information, or products sold, under the domain name; (2) that no non-REC SPECS products would be advertised or sold on the website; (3) that the agreement did not in any way lessen Halo's ownership of recspecs.com or constitute any ownership by Liberty of the REC SPECS domain name; and (4) that if there are any sales generated from the domain that are not optical frames, the parties would negotiate a royalty payment for such sales. *See id.*

Between 2004 and 2006, Halo and Liberty attempted to negotiate a single new agreement

to provide for Liberty's purchase of Halo and to replace their various existing agreements. *See* Dkt. No. 1 at ¶ 32. They were ultimately unsuccessful in those efforts and instead kept their existing agreements in place while entering into various additional agreements governing their business relationship. *See id.*

In 2005, Halo and Liberty entered into an Outline of Understanding under which Halo would provide consulting services to Liberty on protective sun-wear. *See id.* at ¶ 33; *see also* Dkt. No. 5-9 at 2. The 2005 Outline of Understanding provided for its unilateral termination, by either party, on sixty (60) days notice. *See id.*

In September of 2006, Halo and Liberty entered into a Memorandum of Understanding under which the parties agreed, among other things, that

> [g]iven the strong support by Wal-Mart for REC-SPECS, Liberty and Halo recognize the need to diversify the marketing of F803 product. Therefore the parties agree that Liberty will market other F803 products (Plano or Rx'able) that will not be marked REC-SPECS but which will continue to be ordered through HALO per the current agreements. HALO will continue to receive all PO's for this product and HALO will bill and process the PO's and will test and certify this product consistent with current practice. HALO will use the current agreed upon mark-up margins (34%) for these products.

Dkt. No. 5-10 at 3. Unlike the 2005 Outline of Understanding, the 2006 Memorandum of Understanding did not provide for unilateral termination by either party. *See id.*

Under the 2006 Memorandum of Understanding, Liberty began to order through Halo a new line of "F803" sports protective eyewear, which was marked as Liberty's "F8" collection, which met the ASTM F803 standard. *See* Dkt. No. 1 at ¶ 35. As agreed in the 2006 Memorandum of Understanding, Halo processed, tested, and certified the ordered merchandise, and charged Liberty the agreed upon mark-up over its cost of acquisition. *See id.*

On October 25, 2013, at a meeting requested by Liberty's president, the president told

Peter Leonardi that Liberty's business had changed, that Liberty felt it was paying too much for Halo's inspection, testing, and certification and Liberty's use of the REC SPECS trademark, and that Liberty wanted to negotiate a new contractual relationship with Halo. *See id.* at ¶ 36. At the October 25, 2013 meeting, Liberty's president gave Mr. Leonardi a letter in which he stated that, effective as of December 31, 2013, Liberty was terminating both the 2005 Outline of Understanding and the 2006 Memorandum of Understanding. *See id.* This letter also expressly stated that their 1993 Trademark Licensing Agreement would remain in effect, but made no mention of either the 1992 Distribution Agreement or the 2003 recspecs.com Domain Name Licensing Agreement. *See id.*; *see also* Dkt. No. 5-11 at 2. In a letter dated November 13, 2013, Liberty reconfirmed its intention to terminate the 2005 and 2006 agreements and also that Liberty "intends to fully comply with all provisions of the August 13, 1993 Agreement, including marketing all Liberty Sports protective eyewear under the REC SPEC trademark." Dkt. No. 5-12 at 2. This letter also indicated that Liberty "remain[ed] open to a dialog . . . to come to a new understanding with HALO." *Id.*

According to Liberty, from January 1, 2014 to the present, it has not marketed sports protective eyewear other than REC SPECS branded eyewear, nor has it marketed any sports protective eyewear that would compete against REC SPECS branded eyewear. *See* Dkt. No. 21-1 at ¶ 11. "Though Liberty had, pursuant to the parties' 2006 'Memorandum of Understanding,' marketed certain models without the REC SPECS mark prior to January 1, 2014, all such models have been marketed under the REC SPECS trademark since the December 31, 2013 termination of the parties' 2006 'Memorandum of Understanding.'" *Id.* at ¶ 12. Further, Liberty contends that, "[f]ollowing the December 31, 2013 termination of the parties' 2006 'Memorandum of Understanding,' Liberty began including the REC SPECS marks on all products that had formerly

been exclusively marketed under the 'F8' or 'SPORT SPECS' brands, and also began marketing the 'F8 Collection' as the 'REC SPECS F8 Collection.'" *Id.* at ¶ 13.

Liberty confirms that, since January 1, 2014, Liberty has taken delivery of REC SPECS branded eyewear directly form the manufacturer (Hwa Meei Optical). *See id.* at ¶ 14. Since it began receiving the eyewear directly from the manufacturer, Liberty contends that it "has been inspecting and supervising the quality of all REC SPECS branded eyewear it has received directly from the manufacturer. During that time, other than minor irregularities and cosmetic issues, Liberty has not seen any product defects that would threaten the safety of the glasses it has received directly from the manufacturer." *Id.* at ¶ 15. Moreover, Liberty maintains that it "has been working directly with Hwa Meei Optical since September, 2013 in an effort to identify, address, and correct the most common manufacturing irregularities with the REC SPECS products at the source. As a result of those efforts, rejection rates have dropped substantially, and the shipments Liberty has received directly from Hwa Meei Optical since January 1, 2014 have all had rejection rates of less than 2%, with the most recent shipment from Hwa Meei Optical having a rejection rate of only 0.4%. All such rejections were cosmetic issues not related to safety." *Id.* at ¶ 16. Liberty further contends that, at its request, Hwa Meei Optical has also become A2LA-certified as of April 2014, thereby enabling it to perform spot checks to ensure that the products it produces pass the ASTM F803 tests. *See id.* at ¶ 17.

In its motion for preliminary injunctive relief, Halo contends that, pursuant to the 2006 Memorandum of Understanding, it gave Liberty permission, as required by an earlier contract between the parties, to sell other sports protective eyewear which competes with REC SPECS eyewear – "on the condition that, as with the REC SPECS eyewear, Liberty's orders for all such competing sports protective eyewear be placed through Halo and that Halo thereby be paid an

10

agreed upon mark-up of its cost of acquiring the REC SPECS eyewear (either by manufacturing

the eyewear itself or having it manufactured for it by others . . . ) to compensate Halo for the use

of its registered trademark and for its inspection, testing and certification of the eyewear to ensure

that it meets both Halo's quality control and ASTM F803's impact resistance standards."  Dkt. No.

5-1 at 6.  Halo summarizes their position as follows:

> After doing business in this fashion for over 30 years, Liberty
> recently announced that it was purporting to terminate some, but
> not all, of the parties' written agreements -- while simultaneously
> announcing that it wanted to enter into "a new business
> arrangement with Halo". Although Liberty already has the
> contractual right to purchase Halo from its president or his estate
> (either when he wishes to sell or he passes on), Liberty has
> announced that it wants to purchase not Halo, but only its REC
> SPECS trademark, and that it wants to do so immediately (not when
> Halo's president wishes to sell, or passes on).  At the same time
> Liberty has ceased placing orders through Halo, for either REC
> SPECS eyewear or the sports protective eyewear which competes
> with REC SPECS eyewear.  Instead, Liberty is now ordering all
> sports protective eyewear directly from Halo's Taiwanese
> manufacturer, cutting out Halo and pocketing the agreed upon
> mark-up that it has been paying Halo for the past 30 years.  Liberty
> has done so in an apparent attempt to bring financial pressure to
> bear on Halo and to thus bring Halo to the table to "renegotiate" --
> completely change -- the business relationship that the parties
> agreed to decades ago.  By doing so Liberty has infringed Halo's
> registered trademark, engaged in unfair competition and palming
> off, caused confusion as to the source, origin and quality of the
> sports protective eyewear it sells, and breached the parties' 30+
> years of agreements and their practice and course of conduct
> implementing them, all causing irreparable harm to Halo.
> Accordingly Halo has commenced this litigation and now moves for
> an order granting a preliminary injunction, during the pendency of
> this action, enjoining Liberty from ordering, purchasing, marketing
> or selling . . . protective eyewear other than in accordance with the
> parties' 30+ years of agreements and their practice and course of
> conduct implementing them.

*Id.* at 6-7.

In response, Liberty contends that Halo has attempted to disguise this matter as one of

trademark law when it is actually simply a contract dispute between the parties. *See* Dkt. No. 21 at 5. Further, Liberty argues that, even if Halo had a viable claim, the only harm it would suffer while awaiting a judgment on the merits would be monetary. *See id.* Finally, Liberty contends that, even if Halo could demonstrate irreparable harm, Halo's motion "falls woefully short of showing the requisite likelihood of success on the merits to warrant such extraordinary and drastic relief[.]" *Id.*

# III. DISCUSSION

## A.    Standard of review

In the Second Circuit, where a party seeks preliminary injunctive relief in an action alleging trademark infringement under the Lanham Act, courts apply the four-factor test set forth by the Supreme Court in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 390 (2006). Under that standard, preliminary injunctive relief should issue where the plaintiff has established a likelihood of success on the merits, and that: (1) the plaintiff is likely to suffer irreparable injury in the absence of an injunction; (2) remedies at law, such as monetary damages, are inadequate to compensate the plaintiff for that injury; (3) the balance of hardships tips in the plaintiff's favor; and (4) the public interest would not be disserved by the issuance of a preliminary injunction. *See Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay*, 547 U.S. at 391, 126 S. Ct. 1837).[1] "A showing of irreparable harm is the single most important prerequisite for the issuance

---

[1] In *Salinger v. Colting*, 607 F.3d 68, 78 n.7 (2d Cir. 2010), the Second Circuit extended the test articulated by *eBay*, a patent action involving a permanent injunction, "to preliminary injunctions in the context of copyright cases[.]" Although the Second Circuit did not explicitly extend the *eBay* test to trademark actions, the Court stated that it saw "no reason that *eBay* would not apply with equal force to an injunction in *any* type of case." *Id.* (emphasis in original) (noting that "*eBay* strongly indicates that the traditional principles of equity it employed are the

(continued...)

of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted).

Although irreparable harm may not be presumed upon a showing of a likelihood of success, *see eBay*, 547 U.S. at 393; *Salinger*, 607 F.3d at 80, "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540 (S.D.N.Y. 2011). Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm. *See Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 334 (S.D.N.Y. 2011) (stating that "although a likelihood of confusion does not create a presumption of irreparable injury, a particularly strong likelihood of confusion should weigh in favor of finding irreparable injury," and that "[a] plaintiff may also show a threat of irreparable injury by showing a threatened loss of good will and loss of ability to control its reputation").

The Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Consonant with this view, the Second Circuit has held that a district court may consider hearsay evidence when deciding whether to grant preliminary injunctive relief. *See Mullins v. City of*

---

[1](...continued)
presumptive standard for injunctions in any context"). In light of *Salinger*, district courts in this Circuit have extended *eBay* to trademark actions as well. *See, e.g., U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 539 (S.D.N.Y. 2011) (applying *Salinger*'s extension of *eBay* in a trademark action) (citing *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 265 (E.D.N.Y. 2011) and *NYC Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 328 (S.D.N.Y. 2010)).

*New York*, 626 F.3d 47, 52 (2d Cir. 2010).  Therefore, the strict standards for affidavits under the Federal Rules of Evidence and in support of summary judgment under Rule 56(c)(4) of the Federal Rules of Civil Procedure requiring that an affidavit be made on personal knowledge are not expressly applicable to affidavits in support of preliminary injunctions.  *See Mullins v. City of New York*, 634 F. Supp. 2d 373, 384 (S.D.N.Y. 2009) (citations omitted).  Nevertheless, courts have wide discretion to assess the affidavit's credibility and generally consider affidavits made on information and belief to be insufficient for a preliminary injunction.  *See* 11A Charles Alan Wright et al., Federal Practice and Procedure § 2949 (2d ed. 1995); *Mullins*, 634 F. Supp. 2d at 373, 385, 390 n.115 (declining to fully credit the "defendants' hearsay affidavit" and noting that while the court "may consider hearsay evidence in a preliminary injunction hearing . . . , a court may weigh evidence based on whether such evidence would be admissible under the Federal Rules of Evidence").

In the Second Circuit "there is no hard and fast rule . . . that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it."  *Maryland Cas. Co. v. Realty Advisory Bd. of Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997) (quoting *Consolidated Gold Fields PLC v. Minorco, S.A.*, 871 F.2d 252, 259 (2d Cir. 1989)).  "Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute."  *Id.*

Even if the plaintiff demonstrates irreparable harm and a likelihood of success on the merits, however, the remedy of preliminary injunctive relief may still be withheld if equity so requires.  "An award of an injunction is not something a plaintiff is entitled to as a matter of right, but rather it is an equitable remedy issued by a trial court, within the broad bounds of its

discretion, after it weighs the potential benefits and harm to be incurred by the parties from the granting or denying of such relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68 (2d Cir. 1999) (citation omitted).

**B.    Likelihood of success on the merits**

Since the Court agrees with Liberty that this action is most appropriately classified as a breach of contract action, the Court will address Halo's breach of contract claim first.

### *1. Breach of contract*

Under New York law, a plaintiff alleging a breach of contract claim must allege the following elements: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach. *See Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted); *see also Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (citation omitted).  "In pleading these elements, a plaintiff must identify what provisions of the contract were breached as a result of the acts at issue." *Wolff*, 171 F. Supp. 2d at 358 (citation omitted).

"When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (2d Dep't 2011) (citations omitted).  "In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967, 488 N.Y.S.2d 645, 477 N.E.2d 1099

(1985)).  "When the question is a contract's proper construction, summary judgment may be granted when its words convey a definite and precise meaning absent any ambiguity."  *Id.* (citations omitted).  "Where the language used is susceptible to differing interpretations, each of which may be said to be as reasonable as another, and where there is relevant extrinsic evidence of the parties' actual intent, the meaning of the words become an issue of fact and summary judgment is inappropriate . . . since it is only when there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law."  *Id.*

The Second Circuit has "defined ambiguous language as that which is '"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."'"  *Id.* (quotations omitted).  "Conversely, language is not ambiguous when it has '"a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion."'"  *Id.* (quotations omitted).  "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties' intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence 'may be considered only if the agreement is ambiguous.'"  *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (quotation and other citations omitted).

In the present matter, the parties 1993 Trademark Licensing Agreement provides as follows:

> NOW, therefore in consideration of One dollar (1.00) to each in hand paid, receipt of which is hereby acknowledged and other good and valuable consideration and the mutual covenants and agreements herein contained, the parties do mutually covenant

16

and agree as follows:

    1.  All Liberty Sports protective eyewear will be marketed under the REC SPEC trademark, with the exception of any new brand name labels acquired by Liberty.

    2. Liberty has the exclusive right to REC SPECS trademark name so long as Liberty continues to aggressively market and promote said trademark.  Liberty agrees not to market other sports protective eyewear which would compete against REC SPECS unless agreed to between the parties.

Dkt. No. 5-7 at 2.  The 1993 Trademark License Agreement also provided that Liberty would have the right to purchase Halo (and thereby its REC SPECS trademarks) either from Peter Leonardi, if he decided to sell Halo during his lifetime, or from his estate, if he still owned Halo at the time of his death.  *See id.* at 3.

From the inception of its relationship with Liberty until 2003, Halo would either manufacture its REC SPECS eyewear in Fulton County or have them manufactured by other U.S. manufacturers and then shipped to Halo in Fulton County.  *See* Dkt. No. 1 at ¶ 25.  In 2003, Halo started to have some of its REC SPECS eyewear manufactured in Taiwan.  *See id.* at ¶ 26.  Since 2009, Halo has had all of its REC SPECS eyewear manufactured in Taiwan.  *See id.*  Until January 1, 2014, all orders for products were placed through Halo, who would then inspect the products, ship them to Liberty, and then bill Liberty an agreed upon marked up price.  Since January 1, 2014, however, Liberty has purchased all of its products directly from the Taiwanese manufacturer, thereby depriving Halo of the aforementioned markups.

At oral argument, the following discussion occurred between Liberty's counsel and the Court:

    THE COURT:    But what happened between 1993 and now to make you harken back all of a sudden to the 1993 agreement and say, you know, this trademark, we have the exclusive rights to it and now we're gonna go straight to the manufacturer in Taiwan?

What happened?

MR. PARADISE:      First of all, over the time Halo – it's not that Halo received nothing.  Halo has received millions and millions of dollars as a result of Liberty's successful growing of this brand and sales.  What happened and what changed was Liberty realized that the – they don't need Halo.  When you talk to Halo, they would get the story how these products, they come in, 40 percent of 'em need to be adjusted, there's all these problems with them.  Well, a little bit of talking with the manufacturer and putting the onus on the manufacturer in Taiwan to improve their quality control, and they got accredited as a testing facility and to really, you know, say, look, this just won't work, you know, in today's day, ya know, with what the economy is, we just can't have all these extra expenses, you guys have to provide us with a product that's consistent and works.  And that's been successful and that's been achieved, and what Mr. Leonardi would say used to be a 40 percent defect rate is now down well below one percent with the shipments we're getting from Hwa Meei today.  So, quite frankly, the 30 percent markup which was provided to compensate [Halo] for all of this work and physically inspecting each piece and doing adjustments to what he said was 40 percent, the pieces coming in, just doesn't happen anymore.  And while Liberty was open to the idea of renegotiating a deal and continuing to use Halo's testing services, it couldn't justify it at the 34 percent markup that Halo wants to charge.

THE COURT:      I mean is it your position that you can use the mark in perpetuity and continue to do that without buying the mark from Halo?  Is that what you're saying?

MR. PARADISE:      Yes, that's correct, that's what the agreement provides for.

* * * * *

THE COURT:      But you don't have to pay Halo anything for using the trademark in perpetuity?

MR. PARADISE:      That's correct.  Halo has been paid –

THE COURT:      That doesn't seem fair.

MR. PARADISE:      Fair is not what we're talking about.

THE COURT:      Well it's what I'm talking about.

MR. PARADISE:    I disagree.

THE COURT:    You can use the mark in perpetuity and pay nothing to Halo, that's your position?

MR. PARADISE:    That is our position, yes.

*See* Transcript of Oral Argument dated May 28, 2014 ("Tr.") at 20-22.

Thereafter, the Court asked Liberty's counsel that, "[i]f there's no markup agreement, what does the phrase, . . . 'other valuable consideration' mean in the 1993 agreement?" *Id.* at 23-24.  In response, Mr. Paradise responded as follows: "It's the language that's in every contract like this. It's – you know, it's talking about what consideration was, it talks – you know, there are terms. The fact that there are specific terms in here that state the terms of the agreement, which is so long as Liberty continues to aggressively market and promote the trademark.  It has other agreements as to what restrictions Liberty has.  There's no payment term in here.  At this point, Halo had already received ten years' worth of business that had grown exp[onentially]." *Id.* at 24.

Liberty claims that they have never breached the 1993 Trademark License Agreement and that Halo has received "valuable consideration for the exclusive license;" the Court, however, finds that the evidence before it indicates otherwise.  Although the 1993 Trademark License Agreement leaves much to be desired in terms of its clarity, the agreement nevertheless made sense and provided Halo with adequate protections at the time it was drafted.  As discussed, when the agreement was drafted, Halo manufactured all of its own REC SPECS products.  Over time, however, Halo began to outsource production, but still required orders to be placed through its offices for its products.  Until January of 2014, all orders for products bearing the REC SPECS mark were placed with, and processed by, Halo.  As such, it is clear why the 1993 Trademark License Agreement does not specifically spell out what Halo's compensation was for use of its

license.  Until January of 2014, pursuant to the parties' course of conduct, Halo's compensation for use of its license was the markup it received when an order was placed.

Now, as Liberty's counsel made clear at oral argument, Liberty has decided that it paid Halo a sufficient amount throughout their years of business together so that they may now use Halo's mark without any future payments.  It is well established that parties to a contract may alter or waive the terms of a contract through their course of conduct.  *See Ficus Invs., Inc. v. Private Capital Mgmt., LLC*, 61 A.D.3d 1, 11 (1st Dept. 2009) (citing *CT Chemicals (U.S.A.), Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 597 N.Y.S.2d 284, 287, 613 N.E.2d 159 (1993)).  Even if the Court were to agree with Liberty's arguments that Halo has received all the consideration they were due for the continued use of the REC SPECS mark as required by the 1993 Trademark License Agreement (which it does not), the Court finds that the parties' conduct for the past twenty years has waived or altered the terms of the agreement.  *See id.*  Indeed, such an alteration to the agreement was necessary when Halo stopped manufacturing REC SPECS eyewear itself, and rather outsourced to third party manufacturers.

Additionally, the Court finds that the phrase "other good and valuable consideration" in the 1993 Trademark License Agreement is ambiguous.  "In interpreting an ambiguous contract provision, the factfinder 'should, when possible, apply the same measure as the parties have applied in performing their obligations.'"  *New Windsor Volunteer Ambulance Corp., Inc. v. Meyers*, 442 F.3d 101, 112 (2d Cir. 2006) (citing *William C. Atwater & Co. v. Panama R. Co.*, 255 N.Y. 496, 501, 175 N.E. 189, 191 (1931)) (other citation omitted); *see also Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913) (noting that, of "great" significance is the "practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy").  "'Where an agreement involves repeated

occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.'" *Id.* (citations omitted); *see also Brooklyn Life Insurance Company of New York v. Dutcher*, 95 U.S. 269, 273 (1877) ("There is no surer way to find out what parties meant, than to see what they have done. . . Parties in such cases often claim more, but rarely less, than they are entitled to").

In *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 521 F. Supp. 104 (S.D.N.Y. 1981), the contract at issue contained the following phrase: "'this Agreement has been entered into by the parties . . . for good and valuable consideration receipt of which is hereby acknowledged.'" *Id.* at 111. The court found that the "understanding of the parties with respect to what this consideration was is not set forth in the Document." *Id.* Therefore, the court held that, "in order to ascertain the full and complete understanding of the parties with respect to consideration, it is necessary to look to extrinsic evidence of their intent." *Id.* (citing J. Calamari and J. Perillo, The Law of Contracts § 3-2, p.99).

As in *Sharon Steel Corp.*, the Court finds that the phrase "other good and valuable consideration" is ambiguous. Looking to the parties' actions, at all relevant times, the parties operated under the assumption that Liberty was required to pay Halo for the use of its mark. Even when Halo stopped manufacturing its products in-house, for approximately ten years, Liberty continued to place its orders through Halo, who then transmitted the orders to the manufacturer. Through this system, Halo was paid a markup over the cost of manufacturing the products which covered, among other things, payment for Halo's quality control services and for use of its REC SPECS mark.

As to Liberty's argument that Halo has already been compensated for the license because

they spent tens of millions of dollars promoting and selling REC SPECS eyewear, the Court finds that argument unpersuasive. At oral argument, it was made clear that, pursuant to the 1993 Trademark License Agreement, Liberty did not make a "lump sum" payment to Halo for use of its mark. *See* Tr. at 15-16. The fact that Halo was not paid a sum certain for the exclusive use of its license further supports Halo's position regarding the interpretation of this ambiguous contract provision.

Based on the foregoing, the Court finds that Halo has established that it will likely succeed on the merits of its breach of contract cause of action.

### 2. Trademark infringement

"The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir. 1987). "Confusion giving rise to a claim of trademark infringement includes [but is not limited to] confusion as to 'source, sponsorship, affiliation, connection or identification.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006) (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005)). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.*

Pursuant to Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(l)(a), trademark infringement exists where a person uses in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark, without the registrant's consent, in connection with the sale, offering for sale, distribution or advertising of any goods or services, where such use is

likely to cause confusion, or to cause mistake or to deceive.  "The essential question in any case of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused. as to the source of the goods in question." *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F. Supp. 915, 924 (S.D.N.Y. 1981).

The reach of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), is much broader than that of Section 32(1), as Section 43(a) proscribes the use in commerce of any:

> word, term, name, symbol, or device ... or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person, or
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities . . . .

15 U.S.C. § 1125(a).  Section 43(a) protects against the infringement of trade names and trademarks, whether registered or not.  *See Warner Bros., Inc. v. Gay Toys, Inc.*, 658 F.2d 76, 77-78 (2d Cir. 1981).

It is well settled that a licensee's sale of unauthorized goods, *i.e.*, products outside of the license, is likely to confuse the public into believing that such products are in fact manufactured or authorized by the trademark owner.  *See Baskin Robbins Ice Cream Co. v. D&L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983); *see also* McCarthy on Trademarks and Unfair Competition § 25:30 (4th ed.) (noting that "any sales of goods . . . under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark").

The core elements required to demonstrate a violation of Section 32( I) and 43(a) of the Lanham Act are similar.  *See Cuisinarts, Inc. v. Robot-Coupe Int'l Corp.*, 509 F. Supp 1936, 1042 (S.D.N.Y. 1981) ("The same facts which substantiate an action for trademark infringement under § 32 will make out an action for false designation under § 43. . .").  In order to establish a claim for trademark infringement, a plaintiff must show: ( l) ownership of a valid mark entitled to the protection of the law;[2] and (2) defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the defendant's goods.  *See Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 411 (S.D.N.Y. 2006) (citing *Savin Corp. v. Savin Group*, 391 F.3d 439 (2d Cir. 2004)); *see also E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, 90 F. Supp. 2d 277, 292 (S.D.N.Y. 2000) ("The likely confusion may relate to the source of the product . . . or to affiliation with or sponsorship of the alleged infringer by the trademark owner").

Once a trademark is registered by the PTO, the registration serves as *prima facie* evidence of the mark's validity.  *See* 15 U.S.C. § 1115(a).  A trademark that has been registered for five years becomes incontestable and once incontestable enjoys a conclusive presumption of distinctiveness.  *See* 15 U.S.C. § 1115(b).

Generally, in determining the likelihood of confusion, courts in the Second Circuit are obliged to consider the eight factors set forth by Judge Friendly in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961):

> (i) the strength of the plaintiff's mark;
>
> (ii) the similarity of the parties' marks;
>
> (iii) the proximity of the parties' products in the marketplace;

---

[2] Liberty does not contest that Halo has a valid registered trademark entitled to the protection of the law.

> (iv) the likelihood that the plaintiff will bridge the gap between the products;
>
> (v) actual confusion;
>
> (vi) the defendants' intent in adopting their mark;
>
> (vii) the quality of the defendants' product; and
>
> (viii) the sophistication of the relevant consumer group.

*Id.* at 495–96; *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006).

In the present matter, the 1993 Trademark License Agreement contained the following conditions:

> 1.    All Liberty Sports protective eyewear will be marketed under the REC SPEC trademark, with the exception of any new brand name labels acquired by Liberty.
>
> 2.    Liberty has the exclusive right to REC SPECS trademark name so long as Liberty continues to aggressively market and promote said trademark. Liberty agrees not to market other sports protective eyewear which would compete against REC SPEC unless agreed to between the parties.

Dkt. No. 5-7.

In the parties 2005 Outline of Understanding, Mr. Leonardi agreed to assist Liberty in creating a new line of "protective" sunglasses, of which Mr. Leonardi was to be paid a portion of the net selling price and for his testing and certification services of ordered products. *See* Dkt. No. 5-9. Further, the agreement provided that Liberty would have exclusive control over the marketing of new collections "(including decisions whether to use RecSpecs trademark for that Sunwear line)." *Id.*

Additionally, pursuant to the 2006 Memorandum of Understanding, Liberty was given permission to begin marketing other F803 products not bearing the REC SPECS name, which

would compete with REC SPECS.  *See* Dkt. No. 5-10.  In consideration for granting its

permission to market these products, Halo would receive all purchase orders for these products

(with a 34% markup) and test and certify that the products were "consistent with current

practice."  *Id.*  They further agreed in the 2006 agreement that Liberty would not "market the non-

Rec-Specs product in a manner which will cause confusion with Rec-Specs (for example, displays

will be kept separate and the non-Rec-Spec product will not be associated with Rec-Specs (e.g.,

not sold or displayed on the Rec-Specs website and not advertised 'by the same people who

brought you Rec-Specs").  Dkt. No. 5-10 at 2.  In January 2014, after it terminated the 2006

Memorandum of Understanding, Liberty continued to sell its "F8" line of eyewear, but now called

them the "REC SPECS F8" collection.  *See* Tr. at 6, 8-9, 33-34.

      When Liberty terminated the 2005 and 2006 agreements, they forfeited the right to market

products that competed with REC SPECS because Halo's permission was required pursuant to the

1993 Trademark License Agreement.  Liberty would have the Court believe that a product that

was called the "F8 Collection" on December 31, 2013, which was renamed the "REC SPECS F8

Collection" is somehow in compliance with the 1993 Trademark License Agreement.  Although

creative, the Court disagrees.  Pursuant to the 1993 Agreement, Liberty was permitted to label all

of its then existing sports eyewear with the REC SPECS trademark; any new labels it acquired

after the agreement still required Halo's permission for use of the mark.  Similarly, Liberty was

required to obtain Halo's permission to sell any newly acquired sportswear acquired after the

1993 agreement was executed which would compete with REC SPECS.  Clearly, by attaching the

REC SPECS mark on a product that was created long after the 1993 Trademark License

Agreement, and which was never intended to be labeled as a REC SPECS product, Liberty acted

beyond the consent Halo granted it in the 1993 Trademark License Agreement.  *See Baskin*

*Robbins Ice Cream Co.*, 576 F. Supp. at1060; *see also* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 25:30 (4th ed.) (noting that "any sales of goods . . . under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark").

Based on the foregoing, the Court finds that Liberty's marketing of its "REC SPECS F8 Collection" undoubtedly confuses as to the origin or sponsorship of the product. *See* Liberty Sport, *Slam* available at http://www.libertysport.com/eyewear/protective-sport/slam.html#.U6B-LiiGdOI (last visited June 15, 2014) (advertising a protective eyewear product called "SLAM" as being part of the "REC SPECS F8 Collection"); *see also C=Holdings B.V. v. Asiarim Corp.*, ___ F. Supp. 2d ___, 2013 WL 6987165, *9-*10 (S.D.N.Y. 2013) (holding that when an ex-licensee continues to use a mark after it no longer has permission to use the mark establishes likelihood of confusion as a matter of law) (citation omitted). Based on the foregoing, the Court finds that, in the alternative, Halo has established a likelihood of success on the merits of its trademark infringement claim.

**C.    Irreparable harm**

Liberty contends that Halo cannot establish irreparable harm for several reasons. *See* Dkt. No. 21 at 7. First, Liberty argues that Halo's reputation is not at risk because they may inspect the quality of Liberty's products that are being sold under the REC SPECS mark. *See id.* at 7-8. Second, Liberty asserts that, since Liberty's name is placed on the products it sells, it has great incentive to ensure that all products it sells are free of defects. *See id.* at 8. Third, Liberty claims that Halo's allegations regarding the rejection rates of products it has inspected are unfounded. *See id.* at 9-10. Finally, it argues that Halo is not an A2LA-certified ASTM F803 tester and, therefore, all certifications that a product meets the ASTM F803 standard are provided by a third

party lab. *See id.* at 10-11.

Contrary to Liberty's contentions, the Court finds that Halo has established that it will suffer irreparable harm absent an injunction.  The evidence before the Court establishes that, prior to January of 2014, Halo processed and received the orders placed for products bearing the REC SPECS mark at its office in Gloversville, New York.  *See* Dkt. No. 5-2 at ¶¶ 15-16.  According to Mr. Leonardi, "[a]t all times from 1983 until the events in 2014 giving rise to this litigation, and whether the product was manufactured by Halo itself or for Halo by its U.S. or Taiwanese manufacturers, before it sold, invoiced and shipped the product to Liberty, Halo's employees inspected each and every unit of the REC SPECS eyewear to ensure that there were no blemishes or defects, that the strap was attached properly, that the lens was not scratched, that the nose pads and side pads (if any) were properly attached to the frame and that the REC SPECS eyewear had been properly assembled and labeled." *Id.* at ¶ 17.

At oral argument, Liberty's counsel argued that it has worked with the Taiwanese manufacturer to improve their quality control.  *See* Tr. at 20-22.  In fact, the manufacturer is now an accredited testing facility and Liberty contends that they have been able to significantly reduce the number of defective products that are shipped from the facility.  *See id.* at 20-22, 28-30. Although the Court has no reason to doubt that Liberty has worked with the Taiwanese manufacturer to improve the quality of the products it makes bearing the REC SPECS mark, it does not change the fact that Halo has lost the ability to control the quality of the products bearing its mark.  Even though Liberty contends that they are willing to send Halo samples it receives to test for defects or that Halo may inspect the products at Liberty's facility in New Jersey, this is still insufficient to protect Halo's interests.  According to Mr. Leonardi, before Liberty began ordering directly from the Taiwanese manufacturer, his employees personally inspected each

product bearing the REC SPECS mark, not merely a small sample of the products.  Further, although Liberty has offered to permit Halo/Mr. Leonardi to inspect products at their facility, the simple fact of the matter is that Mr. Leonardi and his employees are located almost 200 miles from Liberty's facility in Fairfield, New Jersey.

Additionally, pursuant to the 2006 Memorandum of Understanding, Liberty was given permission to begin marketing other F803 products not bearing the REC SPECS name, which would compete with REC SPECS.  *See* Dkt. No. 5-10.  In consideration for granting its permission to market these products, Halo would receive all purchase orders for these products (with a 34% markup) and test and certify that the products were "consistent with current practice."  *Id.*  In January 2014, after it terminated the 2006 Memorandum of Understanding, Liberty continued to sell its "F8" line of eyewear, but now called them the "REC SPECS F8" collection.  *See* Tr. at 6, 8-9, 33-34.  Clearly, as discussed, labeling a product with the REC SPECS mark that was its competitor days before, and developed for sale at Wal-Mart, without permitting Halo the opportunity to ensure that they meet its quality standards, creates a significant risk of irreparable harm to the reputation of the company.  *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective.  That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark"); *see also El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986) ("One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark. . . .  For this purpose the actual quality of the goods is irrelevant; it is the

control of quality that a trademark holder is entitled to maintain") (citations omitted).

Liberty decided to terminate the 2005 and 2006 agreements that permitted them sell competing brands, which agreements were required by the 1993 Trademark License Agreement. They further agreed in the 2006 agreement that Liberty would not "market the non-Rec-Specs product in a manner which will cause confusion with Rec-Specs (for example, displays will be kept separate and the non-Rec-Spec product will not be associated with Rec-Specs (e.g., not sold or displayed on the Rec-Specs website and not advertised 'by the same people who brought you Rec-Specs"). Dkt. No. 5-10 at 2. Although it is clear that Liberty was permitted to terminate these two agreements, it is also clear that they cannot now simply attach the REC SPECS mark to these competing products and claim that there is no significant risk of harm to Halo.

Based on the foregoing, the Court finds that Halo has established that it will suffer irreparable harm absent preliminary injunctive relief.


**D.    Balance of hardships**

In the present matter, the Court finds that the balance of hardships/equities weighs heavily in Halo's favor in view of the established irreparable harm and the likelihood that the infringing conduct is likely to continue. *See Hilton v. International Perfume Palace, Inc.*, No. 12-CV-5074, 2013 WL 5676582, *13 (E.D.N.Y. Oct. 17, 2013) (citation omitted). The only hardship that Liberty will suffer is that they will have to stop acting in breach of and beyond the scope of the 1993 Trademark License Agreement. *See Tyr Sport, Inc. v. Tyr Natural Spring Water, Inc.*, No. 3:12-cv-761, 2013 WL 2455925, *4 (D. Conn. June 5, 2013) ("The balance of the equities also weighs heavily in the plaintiff's favor, because the only hardship [the defendant] will suffer from this injunction will be that he must cease engaging in further illegal activity").

**E.    Public interest**

Finally, the Court finds that the public interest is served by an injunction in this case.  In this case, "the public has an interest in not being deceived – in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality."  *N.Y. City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 344 (S.D.N.Y. 2010) (citing *SK & F, Co. v. Premo Pharm. Labs., Inc.*, 625 F.2d 1055, 1067 (3d Cir. 1980)) (other citation omitted).

Based on the foregoing, the Court finds that Halo has established its entitlement to an injunction.


**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Halo's motion for a preliminary injunction is **GRANTED**; and the Court further

**ORDERS** that Liberty is hereby **ENJOINED** during the pendency of this action from (1) ordering, purchasing, marketing or selling REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, **or** (2) if Liberty does order, purchase, market or sell REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, that it do so in accordance with the parties' agreements, and the custom and practice implementing them as discussed herein; and the Court further

**ORDERS** that this case is referred to Magistrate Judge Dancks for all further pretrial matters; and the Court further

ORDERS that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated:  June 24, 2014
        Albany, New York

Mae A. D'Agostino
U.S. District Judge