**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

HALO OPTICAL PRODUCTS, INC. and HALO
SPORTS AND SAFETY, INC.,

                      **Plaintiffs/Counter Defendants,**

    vs.                                          6:14-cv-282
                                                   (MAD/TWD)

LIBERTY SPORTS, INC., *formerly known as*
LIBERTY OPTICAL MANUFACTURING
COMPANY, INC.,

                      **Defendant/Counter claimant.**

_____

**APPEARANCES:**                             **OF COUNSEL:**

**MCNAMEE, LOCHNER, TITUS &**        **G. KIMBALL WILLIAMS, ESQ.**
**WILLIAMS, P.C.**
677 Broadway
Albany, New York 12207-2503
Attorneys for Plaintiffs/Counter Defendants

**WHEELER, TRIGG LAW FIRM**           **CAROLYN J. FAIRLESS, ESQ.**
370 Seventeeth Street, Suite 4500             **GWEN J. YOUNG, ESQ.**
Denver, Colorado 80202
Attorneys for Defendant/Counter Claimant

**O'CONNELL & ARONOWITZ, P.C.**        **JEFFREY J. SHERRIN, ESQ.**
54 State Street
9th Floor
Albany, New York 12207
Attorneys for Defendant/Counter Claimant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiffs Halo Optical Products, Inc. and Halo Sports and Safety, Inc. (collectively

"Halo") commenced this action on March 13, 2014, alleging trademark infringement and breach

of contract by Defendant Liberty Sports, Inc. ("Liberty"). *See* Dkt. No. 1. In a Memorandum-Decision and Order dated June 24, 2014 (the "June 24 Order"), this Court granted Halo's motion for a preliminary injunction, enjoining Liberty during the pendency of this action from "(1) ordering, purchasing, marketing or selling REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, or (2) if Liberty does order, purchase, market or sell REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, that it do so in accordance with the parites' agreements, and the custom and practice implementing them as discussed herein . . . ." Dkt. No. 34 at 31 (emphasis omitted). On July 23, 2014, this Court denied Liberty's motion for modification of the preliminary injunction to require security from Halo. *See* Dkt. No. 45.

Currently before the Court is Liberty's motion for reconsideration of the preliminary injunction order pursuant to Fed. R. Civ. P. 59(e), which Halo opposes. *See* Dkt. Nos. 38, 48. On August 18, 2014, Liberty submitted a letter motion which the Court accepted as a reply brief in support of its motion for reconsideration. *See* Dkt. No. 51.

## II. BACKGROUND

### A.     The June 24 Order

The Court assumes the parties' familiarity with the background of this case, as detailed in the June 24 Order. *See* Dkt. No. 34.

### B.     Liberty's motion for reconsideration

Liberty argues that this Court made a number of mistakes of law and fact, and that in light of these mistakes the Court's June 24 Order is in error. *See* Dkt. No. 38-1.

First, Liberty argues that this Court's preliminary injunction operates to "prevent Liberty from terminating the 1993 trademark license agreement and selling sports protective eyewear that

does not carry the REC SPECS mark." Dkt. No. 38-1 at 6. Liberty contends that, "at a minimum, this Court's preliminary injunction order should be modified to reflect Liberty's right to cease its marketing and promotion of REC SPECS branded goods in favor of selling only non-REC SPECS branded eyewear." *Id.* at 7. Consequently, Liberty requests that this Court modify the preliminary injunction to reflect its right to "cease ordering, purchasing, marketing or selling REC SPECS eyewear altogether . . . ." *Id.*

Second, Liberty claims that "[t]his Court's determination regarding likelihood of success on the merits of Halo's trademark infringement claims . . . was based on a regrettable misunderstanding." *Id.* at 8. According to Liberty, "it is beyond dispute that the 'SPORT SPECS' and 'F8' designs were *always* fit to be labeled as REC SPECS products," because "the 'SPORT SPECS' designs have simultaneously been sold under the REC SPECS mark from the very start, and the 'F8' models have always been considered a closely related, but *superior*, product to the models sold under the REC SPECS brand." *Id.* at 9. Due to Liberty's clarification, they request "that the Court revise its opinion to reflect that Halo has failed to carry its burden on preliminary injunction . . . ." *Id.* Liberty also contends that this mistake of fact led to the Court's finding that "'labeling a product with the REC SPECS mark that was its competitor days before, and developed for sale at Wal-Mart, without permitting Halo the opportunity to ensure that they meet its quality standards, creates a significant risk of irreparable harm to the reputation of the company.'" *Id.* Consequently, Liberty requests that the Court's determination "that adding the REC SPECS mark to the 'SPORT SPECS' and 'F8' models posed a risk to Halo's reputation[,]" be removed from the record. *Id.* at 11. Liberty also claims that "when [this] flawed premise is removed, there is no longer sufficient grounds for finding irreparable harm, and therefore, . . . this Court should withdraw its order of preliminary injunction altogether." *Id.*

3

Third, Liberty argues that "irreparable harm also cannot properly be predicated on the contention that Halo is being denied a 'sufficient' opportunity to inspect the products in question." *Id.* at 13. Liberty points to its statement that they "'will comply with any reasonable request from Halo to inspect the REC SPECS eyewear Liberty obtains directly from its manufacturer so that Halo may police its mark.'" *Id.* at 11.

Fourth, Liberty addresses Halo's likelihood of success on the breach of contract claim, because Liberty "was deprived of an opportunity to address [Halo's] breach of contract theory." *Id.* at 15. As to this point, Liberty makes the following arguments: (1) "'other good and valuable consideration' cannot logically be construed by referencing a course of conduct that began twelve years after execution and which took place pursuant to subsequent agreements[;]" (2) "on the law, there is insufficient justification to find 'other good and valuable consideration' to be ambiguous[;]" and (3) that, "on the equities, a straight construction of 'other good and valuable consideration' would be entirely fair . . . ." *Id.* at 16-21.

## C. Halo's memorandum of law in opposition to Liberty's motion

In Halo's memorandum of law they chronicle the motions leading up to this Court's June 24 Order, including that Liberty "did not then, or at any time before the Court issued its Memorandum-Decision and Order on June 24, request permission to submit additional papers on that, or any other, subject." Dkt. No. 48 at 5. Halo also states that they "will not attempt to address each of Liberty's proffered arguments and 'clarifications' which, Halo submits, represent not a motion for reconsideration of specific findings [of] fact or conclusions of law but a motion for the wholesale reargument of virtually every aspect of the Court's Memorandum-Decision and Order." *Id.* at 8.

In regard to Liberty's request that this Court modify the terms of the preliminary

injunction, Halo argues that any modification is unwarranted. *Id.* Halo references the Court's June 24 Order, which held that the Liberty "forfeited the right to market products that competed with REC SPECS because Halo's permission was required pursuant to the 1993 Trademark License Agreement." *Id.* at 12. Accordingly, Halo argues that any modification to the preliminary injunction would allow Liberty to make an "end-run around this Court's injunction[,]" and therefore the requested modification should be denied. *Id.* at 13.

Finally, Halo claims that "whoever contributed how much to REC SPEC's notoriety as of 1992 - or 1993 - is irrelevant[,]" because the parties chose to enter into written agreements, starting with the 1992 agreement, "and continuing through the 2005 and 2006 agreements . . . ." *Id.* at 15. Halo also notes that "Liberty's argument ignores, misstates or glosses over the facts concerning efforts to promote and distribute REC SPECS in the 14 years before Halo granted Liberty any rights under the 1993 Trademark License Agreement." *Id.*

### D.     Liberty's reply brief

In its reply brief, Liberty outlines "five mistakes of law and fact that are apparent from, and central to, the Court's conclusions in its memorandum-decision and order." Dkt. No. 51 at 1. They include the following:

> (1) Mistake of Law: As written, the preliminary injunction order would improperly prevent Liberty from exercising its inherent right to terminate the 1993 Trademark License Agreement and sell sports protective eyewear that does not carry the REC SPECS Mark. (*See* Opening Br. 2-3)
>
> (2) Mistake of Fact: The "SPORT SPECS" and "F8" models are not unfit to bear the REC SPECS mark. On the contrary, the "SPORT SPECS" models have always had an identical REC SPECS-branded counterpart, and the "F8" line was a nearly identical premium brand that otherwise used the same patented "F803" design. (*See id.* at 4-7.)
>
> (3) Mistake of Fact: Liberty's offer to allow Halo to inspects the

5

subject products was not limited to the options considered by the Court. On the contrary, Liberty made an entirely unrestricted commitment to "comply with any reasonable request from Halo." (*See id.* at 7-10.)

(4) Mistake of Fact: Liberty did not pay mark-ups to Halo at any time prior to the point when the parties began using an untested Taiwanese manufacturer, and Halo agreed to take on the responsibility of receiving and inspecting the goods. Moreover, such mark-ups were paid for those services pursuant to the 2005 "Outline of Understanding" and the 2006 "Memorandum of Understanding," both of which were freely terminable (*see* Dkt. No. 34 at 30) and thus consistent with the notion that Liberty already held unrestricted rights to mark products with the REC SPECS mark pursuant to the 1993 Trademark License Agreement. (*See id.* at 12-15.)

(5) Mistake of Law: Under New York law, there is insufficient justification to find "other good and valuable consideration" to be ambiguous in this context. A recent opinion of the New York Appellate Division distinguished the S.D.N.Y. opinion relied upon by this Court, and clarified that when a contract "expressly defines consideration by reference to the mutual exchange of promises in the agreement," as it does in the 1993 Trademark License Agreement, it is improper to resort to extrinsic evidence. *Schron v. Troutman Saunders, LLP*, 97 A.D.3d 87, 94 (N.Y. App. Div. 2012). (*See* Opening Br. 15-17.)

*Id.* at 1-2. Liberty claims that this "corrected record" makes clear that the preliminary injunction was granted incorrectly, and requests that this Court "dissolve the existing preliminary injunction." *Id.* at 3.

### III. DISCUSSION

**A.     Standard of review**

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g). *See Maye v. New York*, No. 1:10-cv-1260, 2011 WL 4566290, *2 n.6 (N.D.N.Y. Sept. 29, 2011). "'In order to prevail on a motion for reconsideration, the movant must satisfy stringent requirements.'" *Id.* (quoting *C–TC 9th Ave. P'ship v. Norton Co. (In re C–TC 9th Ave.*

*P'ship)*, 182 B.R. 1, 2 (N.D.N.Y. 1995)). A motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc*., 70 F.3d 255, 257 (2d Cir. 1995). "The prevailing rule 'recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice.'" *Maye*, 2011 WL 4566290, at *2 (quoting *In re C–TC 9th Ave. P'ship*, 182 B.R. at 3). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257.

**B.     Analysis**

### *1. Liberty's right to terminate the 1993 Trademark License Agreement*

Liberty claims that the preliminary injunction must be modified to protect its "inherent right to terminate the 1993 Trademark License Agreement and sell sports protective eyewear that does not carry the REC SPECS Mark." Dkt. No. 51 at 1.

The 1993 Trademark Licensing Agreement was drafted at a time when Halo manufactured all of its products. Over time, Halo started using other manufacturers to fill orders placed, until eventually all orders were filled through the Taiwanese manufacturer. Although generally the Court would agree that a party to a contract should be able to terminate that contract provided that they comply with the contract's termination provision, the situation here is unique. As Liberty stated in its motion for reconsideration, the "SPORT SPECS" and "F8" lines are "not 'newly acquired sportswear' as the Court suggest[ed] . . . but rather, products made according to the parties' jointly patented 'F803' designs." Dkt. No. 38-1 at 9. As Liberty admits, Halo jointly

7

patented the F803 designs with Liberty. It would be patently unfair to permit Liberty to simply change the name of the product to something other than REC SPECS, while still maintaining the same design based on Halo's patents, yet provide nothing to Halo in consideration for use of its design. That very conduct is what prompted this very litigation.

Based on the foregoing, the Court denies Liberty's request to modify the preliminary injunction.

### *2. Liberty's claimed mistakes of fact and clarifications*

In regard to Liberty's assertions that the Court was misled regarding facts surrounding the preliminary injunction, the Court finds these arguments without merit.

Liberty contends that the "F8" and "SPORT SPECS" models were fit to be labeled as REC SPECS because all of the models used the same patented design and were manufactured in the same place. Dkt. No. 38-1 at 8. First, Liberty could have included this fact in earlier submissions, but a search of the record reveals that it was included for the first time in this motion for reconsideration. *See Maye*, 2011 WL 4566290, at *2 (quoting *In re C–TC 9th Ave. P'ship*, 182 B.R. at 3). Second, had this fact been included in earlier submissions or addressed at oral argument, it would not have changed the Court's decision. The Court's holding turns on whether Liberty "acted beyond the consent Halo granted it in the 1993 Trademark License Agreement." Dkt. No. 34 at 26. Whether the "F8" and "SPORT SPECS" models *could* have been labeled as REC SPECS is not material, because the Court's Memorandum-Decision and Order holds that Liberty did not have Halo's *permission* pursuant to the 1993 Trademark License Agreement. *Id.* at 27. It is for this reason that "the Court [found] that Liberty's marketing of its 'REC SPECS F8 Collection' undoubtedly confuses as to the origin or sponsorship of the product." *Id.*

Liberty next argues that the Court did not consider that Liberty's offer to allow inspection

8

of all REC SPECS products was an "unrestricted commitment to 'comply with *any* reasonable request from Halo . . . ." Dkt. No. 38-1 at 11 (emphasis in original). The following language is from Liberty's opposition to the motion for a preliminary injunction and it supports the opposite conclusion:

> According to Halo, the *only* way its reputation can be protected is for this Court to order Liberty to allow Halo itself to inspect every piece of REC SPECS branded eyewear before it goes on sale. To be clear, Liberty fundamentally disagrees with that premise . . . . Nevertheless, the point is moot: as already noted above, Liberty *will* comply with any reasonable request from Halo to inspect the REC SPECS eyewear Liberty obtains directly from its manufacturer so that Halo may police its mark.

Dkt. No. 21 at 8 (emphasis in original). Liberty set forth what they admit to be the only relief that Halo would find acceptable and then "fundamentally disagree" that such relief is appropriate. *Id.* Liberty's actual statement notes that they will "comply with any reasonable request" to inspect REC SPECS branded eyewear and implies that Halo's request is unreasonable. *Id.*[1] Further, prior to Liberty ordering directly from the Taiwanese manufacturer which prompted this litigation, all products were ordered through Halo, who then placed the orders with the manufacturer. The products were then shipped directly to Halo before being sent to Liberty, thereby permitting Halo to inspect as many of the products as it desired.

Liberty's last claimed mistake of fact is that they "did not pay mark-ups to Halo at any time prior" to those services pursuant to the "2005 'Outline of Understanding' . . . ." Dkt. No. 51 at 2. A review of the record reveals that the Court took Liberty's assertion into consideration in the June 24 Order, as this assertion was central to Liberty's argument. *Lichtenberg v. Besicorp*

---

[1] During oral argument, Liberty stated "I don't see any reason why samples couldn't be sent up to him[,]" and "[i]f he wants to do more, he can do that." Dkt. No. 38-1 at 12. Although Liberty implies otherwise, it never gave "an unrestricted commitment to 'comply with any reasonable request from Halo.'" Dkt. No. 51 at 2.

*Group Inc.*, 28 Fed. Appx. 73, 75 (2d Cir. 2002) (finding that for a moving party to prevail, they "must demonstrate that the Court overlooked controlling decisions or factual matters that were put before the Court on the underlying motion" (citations omitted)).  Also, this argument is disingenuous.  The "markup" only became an issue when Halo decided to outsource the manufacturing of its products, rather than make them itself.  As Liberty discussed during oral argument, Halo necessarily charged more for their products than simply their cost of production, *i.e.*, a "markup."  Dkt. No. 36 at 19-20; *see also Markup Definition*, MERRIAM-WEBSTER, http://www.merriam-webster.com/dictionary/markup (last visited Mar. 4, 2015) (defining "markup" as "an amount added to the price of something: the difference between the cost of producing something and its selling price").

Based on the foregoing, the Court holds that Liberty has not set forth any facts warranting a modification of this Court's preliminary injunction.

### 3. *Insufficient justification to find "other good and valuable consideration" ambiguous*

Liberty contends that they were prevented from responding to Halo's reply memorandum of law and supplemental letter motion.  Dkt. No. 38-1 at 15.  First, the record does not contain a request from Liberty to submit papers that address Halo's additional arguments.  Since they made no such request, it cannot be said that they were "prevented" from addressing Halo's arguments.  Second, Liberty is the one that argued in its response to Halo's motion for a preliminary injunction that this case is more appropriately viewed as a contract dispute.  *See* Dkt. No. 21 at 5-6.  Having made that argument, Liberty cannot complain when the Court agrees.  Finally, Liberty was given the opportunity to address these arguments at oral argument and did so, agreeing with the Court that this matter is more appropriately viewed as a contract case.  *See* Dkt. No. 36 at 23-24.

Next, Liberty cites a New York First Department case that distinguishes *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 521 F. Supp. 104 (S.D.N.Y. 1981). *See Schron v. Trautman Saunders, LLP*, 97 A.D.3d 87 (1st Dep't 2012). In *Schron*, the defendants sought to avoid the language of an option to purchase a national nursing-home company by incorporating into it a separate loan agreement through the use of parol evidence. *See id.* at 89. "The consideration for the option was 'the mutual covenants and agreements hereinafter set forth, and other good and valuable consideration (the receipt and adequacy of which is hereby acknowledged by the Parties).'" *Id.* (emphasis omitted). "The consideration for exercising the option was $100 million, 'all or a portion of which may be paid through assumption, satisfaction or other elimination of . . . liability on debt in the dollar amount of the component of the exercise price paid by this method.'" *Id.* The court declined to permit extrinsic evidence because it would have modified the agreement "to require new and additional consideration not included in the option agreement itself." *Id.* at 92. Further, the court found that the option agreement was unambiguous as to the meaning of consideration. The option clearly set forth that the option price and loan amount were both $100 million. *See id.* Finally, the court noted that, even when a contract provision is unambiguous, "parol evidence is admissible to explain consideration or to show whether it had in fact been given even where its receipt is received in an agreement[.]" *Id.*

Further, the *Schron* court discussed *Sharon Steel Corp.*, and noted that the district court there "allowed parol evidence to establish 'the understanding of the parties' with respect to 'good and valuable consideration' in the context of the boilerplate provision of the contract at issue." *Id.* at 94 (citing *Sharon Steel*, 521 F. Supp. at 111). The appellate division found that the trial court "correctly distinguished *Sharon Steel* from the instant case because the . . . option agreement expressly defines consideration by reference to the mutual exchange of promises in the

11

agreement." *Id.*

The Court finds Liberty's reliance on *Schron* misplaced. In the present matter, the 1993 Trademark Licensing Agreement provided that it was made "in consideration of One dollar (1.00) to each in hand paid, receipt of which is hereby acknowledged and other good and valuable consideration and the mutual covenants and agreements herein contained[.]" Dkt. No. 5-7 at 2. Unlike the situation in *Schron*, the 1993 Trademark Licensing Agreement did not specifically set forth what "consideration" actually was for the use of the REC SPECS trademark. As such, the Court's use of parol evidence in the present matter was not to contradict a term of an unambiguous agreement, but was simply used to explain "'the understanding of the parties' with respect to 'good and valuable consideration' in the context of the boilerplate provision of the contract at issue." *Schron*, 97 A.D.3d at 94 (citing *Sharon Steel*, 521 F. Supp. at 111). Further, the Court's use of parol evidence was permissible because it was to determine whether "consideration" had actually been given, *i.e.*, paid in full, for the continued and perpetual use of the REC SPECS trademark.

Additionally, absent from the 1993 Trademark Licensing Agreement is any discussion regarding how products bearing the REC SPECS trademark were to be purchased, or through whom. Clearly, in the absence of such language, parol evidence is necessary to determine the intentions of the parties. It is also clear that parol evidence was not used to modify any such term because, as discussed, it is absent from the contract.[2]

Based on the foregoing, the Court denies Liberty's motion for reconsideration.

---

[2] In its motion, Liberty points out that the "Court accepted Halo's basic position, but yet supported its holding in that regard with cases of the Court's own finding." Dkt. No. 38-1 at 16. Before deciding any pending motion, the Court has the duty to review and familiarize itself with the applicable law, which often involves the review of authority not provided by the parties.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Liberty's motion for reconsideration is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 5, 2015
 Albany, New York

Mae A. D'Agostino
U.S. District Judge