**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**HALO OPTICAL PRODUCTS, INC.; and**
**HALO SPORTS AND SAFETY, INC.,**

                        **Plaintiffs/Counter Defendants,**

    **vs.**                                    **6:14-cv-00282**
                                                     **(MAD/TWD)**

**LIBERTY SPORT, INC.,** *formerly known as*
**LIBERTY OPTICAL MANUFACTURING**
**COMPANY, INC.,**

                        **Defendant/Counter Claimant.**
_____

**APPEARANCES:**                    **OF COUNSEL:**

**MCNAMEE, LOCHNER, TITUS &**        **G. KIMBALL WILLIAMS, ESQ.**
**WILLIAMS, P.C.**
677 Broadway
Albany, New York 12207-2503
Attorneys for Plaintiffs/Counter Defendants

**WHEELER, TRIGG LAW FIRM**         **CAROLYN J. FAIRLESS, ESQ.**
370 Seventeenth Street              **GWEN J. YOUNG, ESQ.**
Suite 4500
Denver, Colorado 80202
Attorneys for Defendant/Counter Claimant

**O'CONNELL & ARONOWITZ, P.C**      **JEFFREY J. SHERRIN, ESQ.**
Albany Office
54 State Street, 9th Floor
Albany, New York 12207-2501
Attorneys for Defendant/Counter Claimant

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

Plaintiffs Halo Optical Products, Inc. and Halo Sports and Safety, Inc. (collectively

"Halo") commenced this action on March 13, 2014, alleging trademark infringement and breach of contract by Defendant Liberty Sport, Inc. ("Liberty"). *See* Dkt. No. 1. In a Memorandum-Decision and Order dated June 24, 2014 (the "June 24 Order"), this Court granted Halo's motion for a preliminary injunction. *See* Dkt. No. 34. On March 5, 2015, this Court denied Liberty's motion for reconsideration of the preliminary injunction order. *See* Dkt. No. 71. On February 22, 2016, this Court denied Liberty's motion for partial summary judgment. *See* Dkt. No. 102.

Currently before the Court is another motion for partial summary judgment filed by Liberty, *see* Dkt. No. 103, and Halo's motion for summary judgment, *see* Dkt. No. 112.

## II. BACKGROUND

### A.     The June 24 Order

The Court assumes the parties' familiarity with the background of this case, as detailed in the June 24 Order. *See* Dkt. No. 34. The Court is aware that some new information has come to light during discovery, but the Court's June 24 Order adequately sets forth the overall background of the case. The Court will discuss any new information to the extent that it is relevant in the Court's analysis of the parties' current motions.

Although Liberty filed its motion for partial summary judgment before Halo filed its motion for summary judgment, the Court will discuss Halo's motion first.

### B.     Halo's Motion for Summary Judgment

Halo argues that it is entitled to summary judgment on all of its claims, and that the preliminary injunction granted in the June 24 Order should now be made permanent. With respect to Halo's breach of contract claims, Halo contends that, when Liberty began directly ordering REC SPECS and certain non-REC SPECS products from Hwa Meei Optical ("Hwa

Meei") instead of ordering the products through Halo, Liberty breached "the parties' agreements and the parties' custom and practice of implementing their agreements." Dkt. No. 112-13 at 14. Halo also claims that any ambiguity in the 1993 Trademark License Agreement has been clarified by the parties' course of conduct over the past several decades. *Id.* at 15-16. As such, Halo believes that it is entitled to summary judgment on its breach of contract claims.

In response, Liberty argues that questions of material fact preclude summary judgment on Halo's breach of contract claims. Liberty claims that once it terminated the 2002 Outline of Understanding and the 2006 Memorandum of Understanding, the only remaining contracts between the parties are the 1992 Distribution Agreement and the 1993 Trademark Licensing Agreement. *See* Dkt. No. 113 at 21. Since neither contract sets forth the price that Halo may charge Liberty for its inspection services or use of the REC SPECS mark, Liberty claims that material facts exist regarding the extent of Halo's damages. *See id.* at 21-23.

Halo also argues that it is entitled to summary judgment on its Lanham Act claims for trademark infringement (*see* section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a)), and unfair competition (*see* section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)). Halo claims that, when Halo gave Liberty permission to sell REC SPECS and sports protective eyewear that competes with REC SPECS, it did so on the condition that Halo would continue to receive the orders for such products and continue to inspect those products. *See* Dkt. No. 112-13 at 20. Halo asserts that it lost the ability to monitor and protect the quality of the products bearing its trademark when Liberty began to purchase such products directly from Hwa Meei. *See id.* As such, Halo argues that it is entitled to summary judgment on its trademark infringement and unfair competition claims.

Liberty counters that Halo has not demonstrated a likelihood of confusion, which is an

essential element of Halo's claims under the Lanham Act. *See* Dkt. No. 113 at 23-25. Liberty notes that Halo failed to address the *Polaroid* factors, which are factors that courts consider when determining whether a likelihood of confusion exists. *See id.* at 24-25. Liberty further argues that Halo has "merely dressed up its breach of contract claim as trademark infringement claims in order to seek damages beyond breach of contract damages, to which Halo is not entitled." *Id.* at 24.

Halo also contends that it is entitled to summary judgment on its New York General Business Law ("N.Y. G.B.L.") claims. Halo does not address the elements of its claims, but refers the Court to its briefing on Liberty's motion for partial summary judgment with respect to Halo's N.Y. G.B.L. claims. *See* Dkt. No. 112-13 at 23. Halo also seeks dismissal of Liberty's remaining counterclaims. *See id.* at 23-24.

Liberty argues that Halo's failure to address its N.Y. G.B.L. claims precludes summary judgment on those claims. *See* Dkt. No. 113 at 27. Liberty also purportedly withdrew its remaining counterclaims in a footnote in Liberty's opposition papers, *see id.* at 28 n.19, but Halo argues that any dismissal of Liberty's counterclaims should be on the merits, *see* Dkt. No. 120-16 at 8. Liberty also makes several general arguments with respect to Halo's request for a permanent injunction, including that there is no reasonable likelihood that the alleged wrong will be repeated, and that Halo has failed to establish irreparable harm. *See* Dkt. No. 113 at 9-13. Liberty further makes several claims with respect to damages that Halo seeks, including that Halo is not entitled to any monetary damages under the Lanham Act, that Halo is not entitled to attorney's fees, that Halo is not entitled to recover both its actual damages and Liberty's profits, and that Halo is not entitled to enhanced or punitive damages. *See id.* at 13-19.

## C.     Liberty's Motion for Partial Summary Judgment

Liberty's motion for partial summary judgment seeks dismissal of Halo's claim for enhanced damages under the Lanham Act, and also seeks dismissal of Halo's claims under sections 349 and 350 of the N.Y. G.B.L. *See* Dkt. No. 103 at 1. Liberty also seeks dismissal of Halo's claim for punitive damages and for damages under N.Y. G.B.L. § 360-l. *Id.*

With respect to Halo's Lanham Act claims, Liberty argues that treble or enhanced damages are inappropriate since Halo can readily calculate its damages. *See* Dkt. No. 103-1 at 4. Liberty contends that Halo can use the documentation of Liberty's direct purchases from Hwa Meei to calculate Halo's damages for the time period that Liberty directly ordered products from Hwa Meei instead of Liberty's regular practice of first placing an order through Halo. *See id.* at 4-5. Liberty's Chief Financial Officer, Franco Tommasino, calculated Halo's purported damages based on the documentation of Liberty's direct purchases from Hwa Meei using two different damage calculations. *Id.*; Dkt. No. 108 at 2-3. As such, it is Liberty's position that since Halo's damages are readily calculable, any enhanced damages would be for punitive purposes only, which are not permitted under the Lanham Act.

Halo argues that its damages are not readily calculable since Halo never had the opportunity to confirm the quantities of the products that Liberty directly purchased from Hwa Meei. *See* Dkt. No. 109-2 at 9. Although Halo was able to confirm the prices of the products that Liberty directly purchased, without the quantities of those products, Halo contends that it cannot accurately determine its damages. *See id.* at 6-7. Halo further argues that even if its damages can be readily calculated, there is a split among courts in the Second Circuit as to whether that precludes an award of enhanced damages under the Lanham Act. *See id.* at 9-10.

Liberty also seeks dismissal of Halo's claims under sections 349 and 350 of the N.Y. G.B.L. Liberty argues that, along with the elements of such claims, Halo "also must show that the

core harm at issue is 'to the public interest in New York at large,' rather than to the plaintiff's business." Dkt. No. 103-5 at 7. Liberty further argues that, in the context of alleged trademark violations, a plaintiff must show that there is a specific and substantial injury to the public interest over and above an ordinary trademark infringement claim. *Id.* at 8. Liberty contends that Halo has not demonstrated any injury to the public over and above the injuries that Halo itself has allegedly suffered. *Id.* at 10. Liberty further argues that Halo has failed to demonstrate that the deceptive acts or false advertising occurred in New York, which is required by the statutes. *See id.* at 11. Accordingly, Liberty argues that its motion for summary judgment seeking dismissal of Halo's N.Y. G.B.L. claims should be granted.

Halo argues that it has sufficiently demonstrated that this case involves a potential harm to the public interest at large. *See* Dkt. No. 109-3 at 10. Halo claims that, once Liberty started directly purchasing products from Hwa Meei, Halo was no longer able to inspect the products that Liberty purchased directly. *See id.* Since the products in this case consist of sports protective eyewear that consumers wear to protect their eyes, Halo argues that there is a potential danger to public health and safety when Halo is not given the opportunity to inspect the products. *See id.* at 10-11. Halo also argues that Liberty's conduct in this case concerns harm to consumers in New York State, thus satisfying that requirement in the statute. *See id.* at 9-10.

Finally, Liberty argues that Halo's claim for punitive damages and Halo's claim for damages under N.Y. G.B.L. § 360-l should be dismissed. *See* Dkt. No. 103-5 at 12-14. Halo did not specifically respond to these arguments.

### III. DISCUSSION

**A.    Standard of Review**

A court may grant a motion for summary judgment only if it determines that there is no

genuine issue of material fact to be tried and that the facts as to which there is no such issue

warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43

F.3d 29, 36 (2d Cir. 1994) (citations omitted).  When analyzing a summary judgment motion, the

court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at

36-37 (quotation and other citation omitted).  Moreover, it is well-settled that a party opposing a

motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the

court is required to resolve all ambiguities and draw all reasonable inferences in favor of the

nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986)) (other citations omitted).  Where the non-movant either does not respond to the

motion or fails to dispute the movant's statement of material facts, the court may not rely solely

on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to

evidence in the record support the movant's assertions.  *See Giannullo v. City of N.Y.*, 322 F.3d

139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion

for summary judgment "would derogate the truth-finding functions of the judicial process by

substituting convenience for facts").

"[S]ummary judgment may be requested not only as to an entire case but also as to a

claim, defense, or part of a claim or defense."  Fed. R. Civ. P. 56(a) advisory committee's note to

2010 amendment.  Summary judgment may also be granted against any part of the remedy sought

by the opposing party's claims.  *See Hamblin v. British Airways PLC*, 717 F. Supp. 2d 303, 307

(E.D.N.Y. 2010).

**B.	Halo's Motion for Summary Judgment**

### *1. Breach of Contract*

Halo has asserted three breach of contract claims: one for Liberty's failure to continue to order REC SPECS products and pay for Halo's inspection and testing of those products in accordance with the parties' agreements and their practice of implementing those agreements; one for Liberty selling sports protective eyewear which competes with REC SPECS eyewear in a manner not permitted by the 1993 Trademark License Agreement; and one for Liberty selling F803 products which compete with REC SPECS eyewear without having those products inspected by Halo, in breach of the 1993 Trademark License Agreement and the 2006 Memorandum of Understanding. *See* Dkt. No. 1 at 14-15.

Under New York law,[1] a plaintiff must allege the following elements to state a claim for breach of contract: (i) the existence of a contract; (ii) adequate performance of the contract by the plaintiff; (iii) breach by the other party; and (iv) damages suffered as a result of the breach. *See*

---

[1] The Court notes that the 1992 Distribution Agreement provides that "[t]his Agreement shall be construed and the legal relations between the parties governed by the laws of the State of New Jersey." Dkt. No. 5-6 at 3. The Second Circuit has held that "even when the parties include a choice-of-law clause in their contract, their conduct during litigation may indicate assent to the application of another state's law." *Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) (citation omitted). "Such 'conduct' indicating the parties' consent to a given state's substantive law can consist of the cases cited and relied upon by the parties in their briefs, and their apparent decision not to raise the choice-of-law issue." *Schneider v. Canal Ins. Co.*, No. 98-CV-5368, 1999 WL 689476, *8 (E.D.N.Y. Sept. 1, 1999) (citing *Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 513 (2d Cir. 1993)); *see also Dulsky v. Worthy*, No. 11 CV 4925, 2013 WL 4038604, *5 n.4 (S.D.N.Y. July 30, 2013) ("[B]ecause the parties cite only New York law in their briefs, the Court will apply New York law . . . .").

In the present matter, neither party has raised a choice-of-law issue nor objected to the Court's application of New York law in the Court's prior decisions. Moreover, the parties have almost exclusively relied on New York law in their briefing throughout the case, including with respect to Halo's motion for a preliminary injunction, *see* Dkt. Nos. 21, 23, and with respect to the present summary judgment motions, *see* Dkt. Nos. 103-1, 103-5, 109-2, 109-3, 110, 112-13, 113, 120-16. It does appear that Liberty cited two New Jersey cases in its opposition to Halo's motion for summary judgment, *see* Dkt. No. 113 at 21, but the vast majority of cases relied on by the parties throughout the three years of this litigation have been New York cases. Accordingly, the Court will continue to apply New York law.

*Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citation omitted); *see also Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 357-58 (S.D.N.Y. 2001) (citation omitted). "In reviewing a written contract, a trial court's primary objective is to give effect to the intent of the parties as revealed by the language they chose to use." *Seiden Associates, Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) (citing *Slatt v. Slatt*, 64 N.Y.2d 966, 967 (1985)). "When the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving practical interpretation to the language employed and the parties' reasonable expectations." *131 Heartland Blvd. Corp. v. C.J. Jon Corp.*, 82 A.D.3d 1188, 1189 (2d Dep't 2011) (citations omitted).

Generally, "a motion for summary judgment may be granted in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning." *Topps Co., v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008) (citation omitted). "To the extent the moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Id.* (citation omitted).

The Second Circuit has "defined ambiguous language as that which is '"capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."'" *Seiden Associates*, 959 F.2d at 428 (quotations omitted). "Conversely, language is not ambiguous when it has '"a definite and precise meaning, unattended by danger of misconception in the purport of

the [contract] itself, and concerning which there is no reasonable basis for a difference in opinion.'"" *Id.* (quotations omitted). "Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties' intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence 'may be considered only if the agreement is ambiguous.'" *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (quotation and other citations omitted).

As outlined in the June 24 Order, the parties have entered into five agreements. The 1992 Distribution Agreement provides that, among other things, Halo agrees "to continue to manufacture high quality sports-safety eyewear products . . . for distribution by Liberty" and that "Liberty agrees to continue to be the exclusive distributor for those Halo safety-eyewear products currently carried by Liberty[.]" Dkt. No. 5-6 at 2. The 1992 Distribution Agreement further provides that either party could terminate the agreement "at anytime for any reason providing the terminating party give the other party twelve (12) months written notice of its desire to terminate." *Id.* Finally, the 1992 Distribution Agreement states that "Liberty shall acquire no rights to the name 'REC SPECS' by virtue of its distribution of products supplied by HALO." *Id.*

The 1993 Trademark License Agreement provides, in relevant part, as follows:

> Now, therefore in consideration of One dollar (1.00) to each in hand paid, receipt of which is hereby acknowledged and other good and valuable consideration and the mutual covenants and agreements herein contained, the parties do mutually covenant and agree as follows:
>
> 1. All Liberty Sports protective eyewear will be marketed under the REC SPEC trademark, with the exception of any new brand name labels acquired by Liberty.
>
> 2. Liberty has the exclusive right to REC SPECS trademark name so long as Liberty continues to aggressively market and promote said trademark. Liberty agrees not to market other sports protective eyewear which would compete against REC SPECS

10

unless agreed to between the parties.

Dkt. No. 5-7 at 2. The 1993 Trademark License Agreement also provides that Liberty would have the right to purchase Halo (and thereby its REC SPECS trademark) either from Peter Leonardi (Halo's president), if he decided to sell Halo during his lifetime, or from his estate, if he still owned Halo at the time of his death. *See id.* at 3.

The 2002 Outline of Understanding[2] provided that "Leonardi will provide consulting services to Liberty Optical on the development and engineering of a 'protective' line of sunwear. Leonardi and Liberty to develop mutually agreed details/deliverables for such consulting services." Dkt. No. 5-9 at 2. The agreement further provided, with respect to F803 product, that "[f]or all product sourced from the Far East, HALO agrees to provide customary testing and certification services. HALO warrants that the price for these services will not be more (on average) than mid 30's percentage of gross profit margin." *Id.* The agreement also contained an exit provision: "[e]ither party has the right to exit agreement with 60 days notice. HALO/Leonardi to continue to receive royalties for all product co-developed to date for the life of the product." *Id.*

The 2003 Licensing Agreement for recspecs.com, which is not particularly relevant to the present dispute, allowed Liberty to use the domain recspecs.com with certain restrictions, including that the information displayed on the website must be approved by Halo and that no non-REC SPECS product could be sold on the website without Halo's permission. *See* Dkt. No. 5-8 at 2.

Finally, the 2006 Memorandum of Understanding allowed Liberty to market "other F803

_____

[2] The Court notes that the parties and the Court originally referred to this agreement as the 2005 Outline of Understanding. However, the parties agree that this contract was actually executed in 2002, so the Court will now refer to it as the 2002 Outline of Understanding.

products (Plano or Rx'able) that will not be marked REC-SPECS but which will continue to be ordered through HALO per the current agreements." Dkt. No. 5-10 at 2. The agreement further provided that "HALO will continue to receive all [purchase orders] for this product and HALO will bill and process the [purchase orders] and will test and certify this product consistent with current practice. HALO will use the current agreed upon mark-up margins (34%) for these products." *Id.* at 2. This agreement was entered into so that Liberty could sell sports protective eyewear that competes with REC SPECS eyewear in accordance with the 1993 Trademark License Agreement. *See* Dkt. No. 5-7 at 2; Dkt. No. 112-1 ¶ 31; Dkt. No. 114 at 23.

Many of the facts relevant to Halo's breach of contract claims are not disputed. Starting in 2003, Halo began to have some of its REC SPECS eyewear manufactured in Taiwan by Hwa Meei. *See* Dkt. No. 112-1 ¶ 27. Starting in 2006, Halo had most of its REC SPECS product manufactured in Taiwan. *See id.* ¶ 35; Dkt. No. 114 at 25. In general, the business relationship between the parties went as follows: Liberty placed an order through Halo; Halo manufactured the product or placed an order with the Taiwanese manufacturer; the manufacturer shipped the product to Halo; Halo tested and inspected the product and shipped it to Liberty; and Liberty paid Halo a mark-up price for Halo's cost of acquiring and inspecting the product. *See* Dkt. No. 112-1 ¶ 35. Liberty does not dispute that this was the general nature of the relationship between the parties, with the exception that Halo cannot "certify" any product as meeting the American Society for Testing and Materials ("ASTM") F803 sport protective tests. *See* Dkt. No. 114-2 ¶ 28; Dkt. No. 114 at 26.

On October 25, 2013, Anthony M. DiChiara, Liberty's president, met with Mr. Leonardi and told Mr. Leonardi that Liberty wanted to negotiate a new business relationship with Halo going forward. *See* Dkt. No. 112-1 ¶ 40; Dkt. No. 114-1 ¶ 27. After they could not agree on the

terms of a new relationship, Mr. DiChiara gave Mr. Leonardi a letter providing that "this letter is to formally notify you that Liberty is terminating both the [2002] Outline of Understanding, and the 2006 Memorandum of Understanding with Halo . . . effective December 31, 2013. For the avoidance of doubt, the [1993 Trademark License Agreement] remains in full force and effect." Dkt. No. 5-11 at 2. The parties did not discuss the 1992 Distribution Agreement, as Mr. DiChiara claims that he did not remember entering into that agreement, although he now acknowledges its existence. *See* Dkt. No. 114-1 ¶¶ 19, 28.

In October of 2013, the month that Mr. DiChiara gave Mr. Leonardi the aforementioned letter, Liberty began directly ordering REC SPECS product from Hwa Meei instead of ordering the products through Halo and paying Halo a mark-up price. *See* Dkt. No. 112-1 ¶ 46; Dkt. No. 110-1 ¶ 2. Liberty claims that it did not start selling any REC SPECS products until January of 2014, which was more than 60 days after the meeting on October 25 where Liberty announced that it was terminating the 2002 Outline of Understanding and the 2006 Memorandum of Understanding. *See* Dkt. No. 110-1 ¶ 2. The 2002 Outline of Understanding contains an exit clause providing that either party can exit the agreement within 60 days, *see* Dkt. No. 5-9 at 2, but the 2006 Memorandum of Understanding does not contain a termination provision, *see* Dkt. No. 5-10 at 2. In a subsequent letter sent by Mr. DiChiara to Mr. Leonardi, Mr. DiChiara explained that he applied the 60-day notice provision from the 2002 Outline of Understanding to the 2006 Memorandum of Understanding, since such notice provision was "reasonable" in Liberty's estimation. *See* Dkt. No. 5-12 at 2.

From January of 2014 through the entry of the Court's preliminary injunction, Liberty also sold its F8 and SPORTS SPECS models with the REC SPECS mark on them. *See* Dkt. No. 114-1 ¶ 31. Liberty apparently believed that these products no longer competed with REC SPECS

because they had the REC SPECS mark on them, and therefore, did not violate the 1993 Trademark License Agreement, which provides that Liberty cannot sell sports protective eyewear that competes with REC SPECS eyewear without Halo's consent. *See id.* ¶¶ 31-32; Dkt. No. 5-7 at 2.

In Liberty's opposition to Halo's summary judgment motion, Liberty makes two arguments. First, Liberty argues that the amount owed to Halo – either a reasonable price or Halo's historic mark-up – is at issue, which precludes summary judgment. *See* Dkt. No. 113 at 20. Second, Liberty argues that what constitutes a "reasonable price" is a question of fact that precludes summary judgment since the agreements in place do not specifically state the price that Halo may charge Liberty for acquiring and inspecting the products. *See id.* at 21. Specifically, Liberty asserts that,

> [t]he only written contracts currently in force between the parties are the 1992 Agreement and 1993 License Agreement . . . . As the Court has noted, neither agreement sets the price Halo may charge Liberty to purchase product, use the REC SPECS mark, or compensate Halo for inspection services. The 1992 Agreement, however, obligates Halo to charge a "reasonabl[e] price" which, Liberty contends, is consistent with the parties' current, respective contributions to product development, marketing, and expansion of the REC SPECS mark.

*Id.*

At the outset, the Court must determine whether Liberty is correct that the 1992 Distribution Agreement and the 1993 Trademark License Agreements were the only agreements in effect between the parties when Liberty started selling products that it directly ordered from Hwa Meei. Generally, under New York law, "a contract that does not contain a termination provision is terminable only upon reasonable notice." *Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 556 (S.D.N.Y. 2009) (citation omitted).

On October 25, Mr. DiChiara gave notice to Mr. Leonardi of his intent to terminate both the 2002 Outline of Understanding and the 2006 Memorandum of Understanding. *See* Dkt. No. 5-11. As such, the 2002 Outline of Understanding was effectively terminated sixty days after October 25 pursuant to the termination clause in the agreement. *See* Dkt. No. 5-9 at 2. However, the 2006 Memorandum of Understanding does not contain a termination provision. *See* Dkt. No. 5-10 at 2. It cannot be said that the 60-day termination provision in the 2002 Outline of Understanding can be automatically applied to the 2006 Memorandum of Understanding, especially since other agreements between the parties have different termination provisions, including the 1992 Distribution Agreement, which was the first agreement entered into between the parties. It may be that the sixty-day notice was sufficient to terminate the agreement, but the Court finds that whether the sixty-day notice was reasonable is a question of fact that cannot be decided at the summary judgment stage. *See Barton d/b/a/ Sterling Worldwide v. Concept Laboratories, Inc.*, No. 09-CV-591, 2010 WL 502831, *4 (W.D.N.Y. Feb. 10, 2010) ("Whether defendant provided reasonable notice of the termination under the circumstances, and what effect the termination has on the viability of the plaintiff's claims, are questions of fact that cannot be disposed of on a motion for summary judgment.").

With that said, clearly at some point after Liberty started directly ordering products from Hwa Meei, the 2006 Memorandum of Understanding terminated. At that point, Liberty is correct that the only pertinent agreements between the parties were the 1992 Distribution Agreement and the 1993 Trademark License Agreement. Liberty is also correct that neither agreement sets forth the price that Halo may charge Liberty for its inspection services or for the use of Halo's trademark. As such, Liberty believes that the amount it owes Halo is a question of fact that cannot be decided at the summary judgment stage.

In Halo's response, Halo does not specifically counter Liberty's argument that questions of fact remain with respect to the amount that Liberty owes Halo. *See* Dkt. No. 120-16. Indeed, Halo offers no specific argument as to why there are no questions of fact regarding its damages. In its original briefing in support of its motion for summary judgment, Halo argues generally that it is entitled to summary judgment because the parties have always operated under the assumption that Liberty would pay Halo for its inspection fees, and that the "practical interpretation of a contract by the parties" is of "great if not controlling" significance. *See* Dkt. No. 112-13 at 15-16.

The Court agrees with Halo that the parties' subsequent conduct is of great importance in determining the parties' intent under the agreements. New York courts have held that "the parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.'" *Federal Ins. Co. v. Americas Ins. Co.*, 258 A.D.2d 39, 44 (1st Dep't 1999) (quoting *Webster's Red Seal Publs. v. Gilberton World-Wide Publs.*, 67 A.D.2d 339, 341 (1st Dep't 1979)). However, Liberty paid Halo the mark-up for the products manufactured in Taiwan pursuant to specific contractual provisions in the 2002 and 2006 agreements. The 2002 Outline of Understanding provides, under the subheading "Source of F803 Product," that "[f]or all product sourced from the Far East, HALO agrees to provide customary testing and certification services. HALO warrants that the price for these services will not be more (on average) than mid 30's percentage of gross profit margin." Dkt. No. 5-9 at 2. Likewise, the 2006 Memorandum of Understanding specifically sets forth that Halo will charge Liberty a 34% mark-up for certain F803 product to be ordered from Taiwan. *See* Dkt. No. 5-10 at 2. Accordingly, from the time Halo started ordering products from Taiwan, Liberty paid Halo a mid 30's mark-up percentage pursuant to the parties' agreements.

As discussed above, summary judgment is appropriate "only when the contractual

language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning" or when ambiguous contract language "may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co.*, 526 F.3d at 68 (citation omitted). Here, once the 2002 and 2006 agreements were terminated, only the 1992 and 1993 agreements were in effect. As the Court found in the June 24 Order, the language regarding the consideration in the 1993 Trademark License Agreement is ambiguous. *See* Dkt. No. 34 at 19. Halo argues that Liberty has always paid Halo a mid-30's percent mark-up, but the Court acknowledges that that mark-up was specifically pursuant to the subsequent agreements. Once those agreements were terminated, there is no relevant extrinsic evidence or course of conduct that definitively establishes that Halo is entitled to a mid-30s percent mark-up. Likewise, the 1992 and 1993 agreements do not definitively establish that Halo is entitled to a mid-30s percent mark-up either. While there is certainly merit to Halo's claim that it is entitled to such a mark-up even absent the subsequent agreements, the Court finds that there may be other reasonable interpretations of the 1993 Trademark License Agreement. As Liberty contends, it could be that Halo is entitled to a reasonable royalty instead of the mark-up price. As such, Liberty is correct that questions of fact exist as to how much Halo is entitled to under the 1993 Trademark License Agreement.

With that said, there are no questions of fact as to whether Liberty owes Halo *something* under the agreements. Liberty essentially concedes that Halo may charge Liberty a reasonable price for REC SPECS products pursuant to the agreements. *See* Dkt. No. 113 at 21. As such, Halo has sufficiently demonstrated that Liberty breached their agreements by not ordering REC SPECS products through Halo and paying Halo at least some amount for those products.

Although the extent of Halo's damages is a question of fact that precludes summary judgment, Halo is entitled to summary judgment as to liability on its breach of contract claims regarding Liberty's failure to order REC SPECS products through Halo.

Moreover, Halo is also entitled to summary judgment as to liability on its breach of contract claim regarding Liberty's sale of F803 products that compete with REC SPECS without Halo's permission. *See* Dkt. No. 1 at 15. The 1993 Trademark License Agreement clearly prohibits Liberty from selling sports protective eyewear that competes with REC SPECS eyewear without Halo's consent. *See* Dkt. No. 5-7 at 2. Liberty concedes that it began selling F8 models that traditionally competed with REC SPECS without Halo's consent. *See* Dkt. No. 114-1 ¶¶ 29-31. Liberty's only defense is that its principals "sincerely believed that, by marketing the F8 collection and SPORT SPECS sports protective eyewear under the REC SPECS mark after January 1, 2014, [they] were complying with the 1993 agreement of not selling competing brands without Halo's consent, given their identical construction to REC SPECS branded products." *Id.* ¶ 31. The Court rejects this argument. Liberty did not have Halo's permission to mark those products with the REC SPECS mark at that time, and those products had traditionally competed with REC SPECS products. As such, Halo is entitled to summary judgment as to liability on that breach of contract claim. As discussed above, the amount that Liberty owes Halo for directly ordering those products without Halo's consent is a question of fact that precludes summary judgment as to damages.

### 2. Trademark Infringement and Unfair Competition

"The Lanham Act creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d

1311, 1314 (2d Cir. 1987). "Confusion giving rise to a claim of trademark infringement includes [but is not limited to] confusion as to 'source, sponsorship, affiliation, connection or identification.'" *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 274 (S.D.N.Y. 2006) (quoting *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 383 (2d Cir. 2005)). "The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Id.* (quoting *Star Indus.*, 412 F.3d at 384.

Pursuant to section 32(1) of the Lanham Act, 15 U.S.C. § 1114(l)(a), trademark infringement exists where a person uses in commerce any reproduction, counterfeit, copy or colorable imitation of a registered mark, without the registrant's consent, in connection with the sale, offering for sale, distribution or advertising of any goods or services, where such use is likely to cause confusion, or to cause mistake or to deceive. "The essential question in any case of alleged trademark infringement brought under the Lanham Act or under the law of unfair competition is 'whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question.'" *Lambda Electronics Corp. v. Lambda Technology, Inc.*, 515 F. Supp. 915, 924 (S.D.N.Y. 1981) (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978)). The reach of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which governs claims for unfair competition, is much broader than that of Section 32(1), as it "protects unregistered trademarks similar to the way that section 32(1) . . . protects registered marks." *Merck & Co., Inc. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 410 n.7 (S.D.N.Y. 2006) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)).

Claims for trademark infringement and for unfair competition under the Lanham Act are

analyzed using the same legal test: a plaintiff must show: (l) ownership of "a valid mark entitled to protection under the statute that the defendant used in commerce, without the plaintiff's consent and in connection with the sale or advertising of goods or services;"[3] and (2) defendant's use of the mark is likely to cause confusion as to the origin or sponsorship of the defendant's goods. *See id.* at 410-11 (citation omitted). "The likely confusion may relate to the source of the product . . . or to affiliation with or sponsorship of the alleged infringer by the trademark owner." *E.G.L. Gem Lab Ltd. v. Gem Quality Institute, Inc.*, 90 F. Supp. 2d 277, 292 (S.D.N.Y. 2000). "Whether there is a likelihood of confusion is 'usually a question of fact.'" *New Colt Holding Corp. v. RJG Holdings of Florida, Inc.*, 312 F. Supp. 2d 195, 220 (D. Conn. 2004). However, "[s]ummary judgment in a trademark action may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely." *Id.* (quoting *Cadbury Beverages v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996)).

"Typically, the question of consumer confusion is governed by reference to the non-exclusive list of factors identified by the Second Circuit in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961). However, the *Polaroid* factors 'are more geared towards comparing two distinct, albeit similar, marks.'" *C=Holdings B.V. v. Asiarim Corporation*, 992 F. Supp. 2d 223, 240-41 (S.D.N.Y. 2013) (quoting *Ryan v. Volpone Stamp Co.*, 107 F. Supp. 2d 369, 400 (S.D.N.Y. 2000)). "By contrast, application of the factors is 'unnecessary' where use of an identical mark . . . is at issue.'" *Id.* at 241; *see also Volpone Stamp Co.*, 107 F. Supp. 2d at 400 ("Thus, [the application of the *Polaroid* factors] may be unnecessary in the case of an ex-licensee using a previously licensed mark where only one trademark is

---

[3] Liberty does not contest that Halo has a valid registered trademark entitled to the protection of the law.

involved.").

In the present matter, the 1993 Trademark License Agreement grants Liberty an exclusive right to the REC SPECS mark, so long as Liberty continues to aggressively market and promote the mark. *See* Dkt. No. 5-7 at 2. At the time that Halo granted Liberty the right to use the mark, Halo manufactured all of its own products. During that time, Liberty paid Halo for manufacturing and inspecting the products, and Halo retained control over the REC SPECS mark through its inspection of the products. *See* Dkt. No. 112-1 ¶ 35; Dkt. No. 114 at 26. When Halo began using Hwa Meei to manufacture REC SPECS products, Halo retained the ability to inspect REC SPECS products pursuant to the parties' 2002 and 2006 agreements. *See* Dkt. No. 5-9 at 2; Dkt. No. 5-10 at 2; Dkt. No. 114 at 26. As such, throughout the course of the parties' entire relationship until Liberty's actions giving rise to this litigation, Halo has always had the ability to inspect REC SPECS products to ensure the quality of products bearing Halo's REC SPECS mark. Although the 1993 Trademark License Agreement leaves much to be desired in terms of its clarity, Liberty has never had the authority to order and sell REC SPECS products without Halo's oversight and inspection of the products bearing that mark. Thus, Liberty's ordering of REC SPECS products and use of the REC SPECS mark on F8 products without Halo's consent and inspection was clearly outside of the scope of the license that Halo granted Liberty for use of the REC SPECS mark.

Liberty primarily argues that Halo has failed to demonstrate a likelihood of confusion, which is an essential element of Halo's trademark infringement and unfair competition claims. *See* Dkt. No. 113 at 24. Liberty argues that Halo has not shown that ordinary prudent purchasers are likely to be misled or confused as to the source of the product, and that Halo has failed to demonstrate that the *Polaroid* factors weigh in its favor. *See id.*

As discussed above, when dealing with an identical mark, like the mark in question here, courts are not necessarily required to analyze the *Polaroid* factors, and in this case, many of the factors are inapplicable.[4]  *See C=Holdings*, 992 F. Supp. 2d at 240-41.  Moreover, it is well established that when a licensee uses a mark beyond the scope permitted in the licensing agreement, the consumer confusion requirement is satisfied.  *See Dallas Cowboys Cheerleaders, Inc., v. Pussycat Cinema, Ltd.*, 604 F.2d 200 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement."); *C=Holdings*, 992 F. Supp. 2d at 241 ("Asiarim has made use of the Commodore trademark to sell its products without the consent of the actual trademark holder.  Asiarim's actions thus constitute use of a counterfeit mark, and consumer confusion is presumed."); *L&L Wings, Inc. v. Marco-Destin, Inc.*, 676 F. Supp. 2d 179, 188 (S.D.N.Y. 2009) ("When an ex-licensee continues to use a mark after its license expires, likelihood of confusion is established as a matter of law.") (citations omitted); *Baskin-Robbins Ice Cream Co. v. D&L Ice Cream Co.*, 576 F. Supp. 1055, 1060 (E.D.N.Y. 1983) ("The sale by a licensee of unauthorized products, i.e., products outside the scope of the license, is likely to confuse the public into believing that such products are in fact manufactured or authorized by the trademark owner.  Thus, such conduct constitutes trademark infringement.") (citation omitted); *see also* McCarthy on Trademarks and Unfair Competition § 25:30 (4th ed.) ("A licensee who bypasses its licensor and directly orders

---

[4] Even if the Court were to analyze the *Polaroid* factors, the Court finds that Halo would succeed in establishing a likelihood of consumer confusion because Liberty deliberately used an identical REC SPECS mark (indeed, Liberty used Halo's exact REC SPECS mark) without Halo's consent.  The Court notes that the factors include (i) the strength of the plaintiff's mark; (ii) the similarity of the parties' marks; (iii) the proximity of the parties' products in the marketplace; (iv) the likelihood that the plaintiff will bridge the gap between the products; (v) actual confusion; (vi) the defendants' intent in adopting their mark; (vii) the quality of the defendants' product; and (viii) the sophistication of the relevant consumer group.  *See Polaroid*, 287 F.2d at 495-96.

trademarked goods from the licensor's manufacturer is an infringer. These goods are not genuine because the licensor has been deprived of the opportunity to exercise quality control."). Here, it is clear that Liberty acted beyond the scope of the licensing agreement when it ordered REC SPECS products without Halo's consent and ability to inspect those products. Moreover, Liberty did not have permission to use Halo's REC SPECS mark on Liberty's own F8 collection, but Liberty used the REC SPECS mark nonetheless.

Given that Liberty acted beyond the scope of the licensing agreement and the parties' conduct thereto, the Court finds that there was a likelihood of confusion as to the origin and sponsorship of the products. Accordingly, Halo is entitled to summary judgment on its trademark infringement and unfair competition claims.

Liberty's reliance on *Hard Rock Café Intern. (USA) v. Morton*, No. 97 Civ. 9483, 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999) is misplaced. Liberty cites that case for the proposition that conduct beyond the scope of a license agreement may weigh in favor of a finding of likelihood of confusion, but weighing against such a finding is insufficient evidence of actual confusion or the defendant's bad faith. *See* Dkt. No. 113 at 25. However, the court in that case concluded that a likelihood of confusion existed, "particularly because [defendant] is a licensee of [plaintiff]." *Hard Rock Café*, 1999 WL 717995, at *30. The court also cited McCarthy on Trademark Goods § 25:30 for the proposition that "[a]ny sales of goods or services under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark." *See id.* (quoting McCarthy § 25:30).

A permanent injunction is the typical remedy when a plaintiff establishes an infringement, and the Court has little trouble concluding that Halo is entitled to a permanent injunction in the present matter. To be granted a permanent injunction, a plaintiff must show a likelihood of

irreparable injury; inadequate remedies at law; the balance of hardships tips in its favor; and that an injunction is in the public interest. *See U.S. Polo Ass'n Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540-41 (S.D.N.Y. 2011). Those requirements are easily met here. "In cases of trademark infringement, a showing of likelihood of confusion establishes the element of irreparable harm." *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 171 (S.D.N.Y. 2007). Courts have held that the loss of reputation and goodwill is not precisely quantifiable, and that remedies at law cannot adequately compensate a plaintiff for injuries as a result of an infringement. *See U.S. Polo Ass'n*, 800 F. Supp. 2d at 540. Moreover, the balance of hardships tips in Halo's favor, as the only hardship Liberty will suffer as a result of an injunction is losing the ability to use Halo's REC SPECS mark without Halo's permission. Finally, the public has an interest in being free from confusion and deception. "Because of the likelihood of consumer confusion in this case, the public interest would be served by the issuance of an injunction, and this factor weighs in Plaintiff's favor." *Id.*

With that said, the Court, at this time, declines to make the preliminary injunction permanent because the Court cannot determine the scope of the injunction until after a trial. As discussed above, the preliminary injunction requires Liberty to pay Halo a mark-up, but there are issues of fact as to how much Liberty is actually required to pay Halo for the inspection of Halo's REC SPECS products and for the use of Halo's trademark. As such, after a trial where the Court can determine the scope of the injunction and how much Liberty is required to pay Halo, the Court will enter a permanent injunction in Halo's favor, barring Liberty from using the REC SPECS mark unless it pays Halo the appropriate amount. The preliminary injunction is still in effect and sufficiently protects Halo's interests until that point.

### 3. Monetary Relief for Halo's Lanham Act Claims

Courts in this district have regularly held that, when a plaintiff seeks an award of damages under the Lanham Act, as Halo does here, "it is well settled that . . . the plaintiff must prove either actual consumer confusion or deception resulting from the violation, or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *Audi AG v. Shokan Coachworks, Inc.*, 592 F. Supp. 2d 246, 274 (N.D.N.Y. 2008) (quoting *Champagne v. Diblasi*, 36 Fed. Appx. 15, 17 (2d Cir. 2002) (other citations omitted)); *see also Haritatos v. Hasbro, Inc.*, No. 6:05-CV-930, 2007 WL 3124626, *6 (N.D.N.Y. Oct. 23, 2007) ("In order to recover damages, 'the plaintiff must prove either actual consumer confusion or deception resulting from the violation . . . or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion.'") (quotation omitted) (emphasis omitted).

In the present matter, Halo does not appear to argue that it is entitled to damages due to actual consumer confusion. Indeed, there is no evidence in the record of actual consumer confusion. Instead, Halo's argument appears to be that Liberty's actions were intentionally or willfully deceptive. In Liberty's opposition to Halo's motion, Liberty argues that when it decided to purchase products directly from Hwa Meei without paying Halo, it acted on the advice of counsel, which "refutes any allegation that Liberty's conduct was willful.'" Dkt. No. 113 at 14. To support this proposition, Liberty relies on *Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC*, No. 11 Civ. 1594, 2013 WL 3479418 (S.D.N.Y. July 9, 2013).

However, as Halo contends, *Bath & Body Works* is readily distinguishable from the present case. In that case, the plaintiff asserted the defense that its actions were innocent and non-willful, and the plaintiff argued that it relied on the advice of counsel in support of this defense. *See Bath & Body Works*, 2013 WL 3479418, at *1. The plaintiff waived its attorney-client

privilege during the deposition of its president, and its president answered several questions regarding the impression that she received from her legal team. *See id.* at *2. The plaintiff also disclosed its outside counsel as an individual likely to have discoverable information. *See id.* Further, the plaintiff produced formerly privileged documents and made its counsel available for a deposition. *See id.*

Moreover, "a party 'cannot be permitted, on the one hand, to argue that it acted in good faith and without an improper motive and then, on the other hand to deny . . . access to the advice given by counsel where that advice . . . played a substantial and significant role in formulating actions taken by [the defendant].'" *Arista Records LLC v. Lime Group LLC*, No. 06 CV 5936, 2011 WL 1642434, *2 (S.D.N.Y. Apr. 20, 2011) (quoting *Pereira v. United Jersey Bank*, Nos. 94 Civ. 1565, 94 Civ. 1844, 1997 WL 773716, *6 (S.D.N.Y. 1997)). "A party who intends to rely at trial on the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a waiver of the advice-of-counsel defense.'" *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 304 (S.D.N.Y. 2001) (quoting *Vicinanzo v. Brunschwig & Fils. Inc.*, 739 F. Supp. 891, 894 (S.D.N.Y. 1990)). In *Wet Seal*, the court in the trademark infringement context held that "[defendant] waived any available advice of counsel defense by objecting, based on the attorney-client privilege, to [plaintiff's] discovery requests related to the registration of [defendant's] mark." *Id.*

In the present matter, Liberty's president, in an affidavit in opposition to Halo's motion for summary judgment, stated that he met with counsel and that counsel informed him that he could terminate the 2002 and 2006 agreements and order REC SPECS products from Hwa Meei directly without consequence. *See* Dkt. No. 114-1 ¶ 29. In his deposition, Liberty's president testified as follows:

Q: A new relationship. Okay. But my question is, is it Liberty's position that it can use the mark REC SPECS in perpetuity and continue to do that without buying the mark from Halo?

[Liberty's counsel]: I am just going to caution the witness, this is getting into litigation strategy, the positions of the company as stated by counsel in its legal brief in this case. So I am just cautioning you not to reveal any communications with counsel or any understandings you received as a result of advice received from counsel. If you can answer the question apart from that, you are free to do that.

A: I can't answer your question.

Q: Are you aware that that's the position that your attorney took on behalf of the company at the oral argument at the motion for preliminary injunction?

[Liberty's counsel]: Again, I give you the same caution.

A: I can't answer it.

Dkt. No. 90-11 at 4-5. Liberty also did not disclose its counsel as individuals having discoverable information, nor did Liberty make its counsel available for depositions. Moreover, Liberty did not submit affidavits from its counsel explaining the advice that they gave to Liberty. As such, Liberty is not entitled to now invoke an advice of counsel defense to support its claim that its infringement was not willful or intentional.

Although Liberty cannot invoke an advice of counsel defense, the Court still finds that questions of fact preclude summary judgment on Halo's claim for damages under the Lanham Act. The Court notes that, "[a]s a general matter, determinations as to bad faith, recklessness, and intent are factual inquiries that are more appropriately resolved by the fact-finder." *MBIA Ins. Corp. v. Cooperatieve Centale Raiffeisen-Boerenleenbank B.A.*, No. 09 Civ. 10093, 2011 WL 1197634, *15 (S.D.N.Y. Mar. 25, 2011). Although Liberty used the REC SPECS mark without Halo's consent, the Court acknowledges that the 1993 Trademark Licensing Agreement is

ambiguous as to what Liberty must pay Halo for the use of its mark. Moreover, once the subsequent agreements were terminated, the only agreements in place were the 1992 and 1993 agreements, and Liberty claims that its principals had no memory of the 1992 Distribution Agreement. Accordingly, whether Liberty's conduct was intentionally deceptive or willful is a question of fact that precludes Halo's entitlement to damages on its Lanham Act claims at this stage.[5] With respect to Liberty's claim in its motion for partial summary judgment that Halo is not entitled to damages under the Lanham Act because Halo's damages are readily calculable, the Court will discuss that argument below.

### 4. Attorney's Fees

Pursuant to the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). "The 'key' to whether a case is 'exceptional' is 'willfulness on the part of the defendant.'" *Municipal Credit Union v. Queens Auto Mall, Inc.*, 126 F. Supp. 3d 290, 299 (E.D.N.Y. 2015) (quoting *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 105-06 (2d Cir. 2012)).

In the present matter, the issue of willfulness cannot be resolved at the summary judgment stage. As such, Halo is not entitled to attorney's fees at this stage of litigation.

### 5. Halo's New York General Business Law Claims

With respect to Halo's claims under N.Y. G.B.L. sections 349 and 350, those claims will

---

[5] Liberty also argues that Halo is not entitled to recover both its damages and Liberty's profits if the same sales are being used to calculate both damages. *See* Dkt. No. 113 at 15. The Court agrees with Liberty that a party cannot recover twice for the same injury, and the Court is mindful that Halo's contract damages may be duplicitous of Halo's damages under the Lanham Act. *See Sparaco v. Lawler, Matusky, Skelly Engineers LLP*, 313 F. Supp. 2d 247, 250 (S.D.N.Y. 2004). With that said, the Court finds that it is premature at this point to determine whether Halo is entitled to damages or Liberty's profits under the Lanham Act, since both involve inquiries regarding Liberty's intent.

be discussed below in the Court's analysis of Liberty's motion for partial summary judgment.

Halo also brought a claim under N.Y. G.B.L. § 360-l for trademark dilution. *See* Dkt. No. 1 ¶¶ 57-58. In Halo's motion for summary judgment, Halo's only argument with respect to this claim is that "[f]or the reasons set forth above and in Halo's papers on Liberty's motion for partial summary judgment concerning Halo's General Business Law claims, it is respectfully submitted that Halo's claims . . . warrant protection, and damages, under [N.Y. G.B.L. §§ 349, 359, and 360-l]." Dkt. No. 112-13 at 23. In Halo's opposition to Liberty's motion for partial summary judgment, Halo does not address its claim under N.Y. G.B.L. § 360-l. *See* Dkt. Nos. 109-2, 109-3. Since Halo has failed to address its claim under N.Y. G.B.L. § 360-l, to the extent that Halo moved for summary judgment on that claim, that motion is denied.

### 6. Liberty's Counterclaims

Halo also moved to dismiss Liberty's two remaining counterclaims. *See* Dkt. No. 112-13 at 23-27. Liberty's first counterclaim alleges that Halo breached the parties' agreements by filing suit to prevent Liberty from using the REC SPECS trademark. *See* Dkt. No. 16 ¶ 87. Liberty's other remaining counterclaim alleges that Halo tortiously interfered with Liberty's economic advantage when Halo sent a letter to Hwa Meei requesting that Hwa Meei stop sending products bearing the REC SPECS trademark directly to Liberty. *See id.* ¶¶ 107-15. In Liberty's opposition to Halo's motion for summary judgment, Liberty purportedly dismissed its remaining counterclaims in a footnote. *See* Dkt. No. 113 at 28 n.19. In Halo's reply to Liberty's opposition, while noting that Liberty did not make a formal motion to withdraw its counterclaims, Halo requested that any dismissal of Liberty's counterclaims should be on the merits. *See* Dkt. No. 120-16 at 8.

Given the Court's ruling that Halo is entitled to summary judgment on its breach of

contract claims and its trademark infringement claims (as to liability), Liberty's remaining counterclaims are necessarily dismissed. Liberty's first counterclaim that Halo breached the parties' agreements by filing the present lawsuit has no merit considering the Court's decision that Liberty breached the parties' agreements by directly ordering products from Hwa Meei without paying Halo. Once Liberty breached those agreements, Halo had every right to commence the present action. Similarly, with respect to Liberty's tortious interference with economic advantage claim, the Court has concluded that Liberty's ordering of REC SPECS products without Halo's consent constituted an infringement, and Halo had every right to notify Hwa Meei to prevent further infringement. As such, Liberty's counterclaims are dismissed.

**C.    Liberty's Motion for Partial Summary Judgment**

### *1. Enhanced Damages under the Lanham Act*

"By its plain language, the Lanham Act permits a district court to enter judgment for 'any sum above the amount found as actual damages, not exceeding three times such amount.'" *Merck Eprova AG v. Brookstone Pharmaceuticals, LLC*, 920 F. Supp. 2d 404, 430 (S.D.N.Y. 2013) (quoting 15 U.S.C. § 1117(a)). However, "[t]he statute makes clear that an enhancement of actual damages must be for 'compensation[,] and not a penalty.'" *Ramada Franchise Systems, Inc. v. Boychuk*, 283 F. Supp. 2d 777, 791 (S.D.N.Y. 2003) (quoting 15 U.S.C. § 1117(a)). As the Second Circuit has explained, the enhancement provision "was included to enable courts to redress fully plaintiffs whose actual damages were difficult to prove." *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103, 110 (2d Cir. 1988). The Second Circuit has also allowed enhanced damages where "deterrence of willful infringement is needed," but the purpose of such an award still must be to compensate a plaintiff for its actual injuries. *See id.* at 113. Accordingly, if there is an evidentiary basis for a plaintiff's actual damages, courts may decline to

award enhanced damages. *See, e.g.*, *Ramada Franchise*, 283 F. Supp. 2d at 791. Moreover, "[o]ne way courts measure how much damage a defendant has caused a plaintiff by infringing the plaintiff's mark is by determining what royalty the plaintiff would have received for a license." *New York Racing Ass'n. Inc. v. Stroup News Agency Corp.*, 920 F. Supp. 295, 302 (S.D.N.Y. 1996) (citations omitted). However, the Court notes that this method of awarding damages is not always favored. *See* McCarthy on Trademarks and Unfair Competition § 30:87 (4th ed.).

Liberty contends that, since Halo can readily calculate its actual damages, any award of enhanced damages would necessarily be punitive in nature. *See* Dkt. No. 103-1 at 6-7. Liberty's chief financial officer, Franco Tommasino, submitted a declaration in support of Liberty's motion, explaining that he reviewed Liberty's business records reflecting the actual quantities of the product that Liberty received directly from Hwa Meei between January 1, 2014 and June 24, 2014. *See* Dkt. No. 108 ¶ 4. Mr. Tommasino claims that he spoke with Ann Anderson, an office manager of Halo, and that Ms. Anderson confirmed the quantities per product model of the products that Liberty received directly from Hwa Meei before the preliminary injunction. *See id.* ¶ 5. Accordingly, Mr. Tommasino submitted a list of all of these products (the "Subsequent Quarantine Analysis"). *See id.* at 11-13. Liberty believes that it is a matter of simple math to calculate Halo's damages based on the mark-up price or the reasonable royalty rate of the products listed in the Subsequent Quarantine Analysis that Liberty purchased directly from Hwa Meei. *See id.* ¶¶ 5-6.

Mr. Leonardi claims that after the Court issued the preliminary injunction, Mr. Tommasino provided Halo with a three-page document entitled "Halo On Hand Quarantine Analysis June 30, 2014" (the "Original Quarantine Analysis"), and Mr. Leonardi attached that document to his declaration in opposition to Liberty's motion. *See* Dkt. No. 109 at 2, 7-10. Halo

claims that this is the document that Ms. Anderson reviewed with Mr. Tommasino, and not the Subsequent Quarantine Analysis. *See id.* ¶¶ 2-4.  Moreover, Halo claims that Ms. Anderson reviewed the Original Quarantine Analysis only to confirm its price and mark-up figures, but not its quantity figures. *See id.* ¶ 4.  The Original Quarantine Analysis documented the sports protective eyewear products which Liberty had received from Hwa Meei but still had on hand as of June 30, 2014. *See id.* ¶ 3.  The Original Quarantine Analysis did not account for the sports protective eyewear that Liberty purchased directly from Hwa Meei but had already resold. *See id.* Halo claims that, while it could confirm the price and mark-up figures in the Original Quarantine Analysis, Halo had no way to confirm, and Ms. Anderson in fact did not confirm, the quantities of the products in that analysis or the quantities of the products in the Subsequent Quarantine Analysis. *See id.* ¶¶ 2-6.  Accordingly, Halo's position is that its damages cannot be readily calculated since it has not confirmed the quantity of the products that Liberty purchased directly from Hwa Meei. *See id.* ¶ 7.

Although Halo was not able to confirm the quantity of products that Liberty purchased from Hwa Meei, the Court could still potentially determine Halo's damages based on the purchase orders of the products that Liberty purchased from Hwa Meei.  However, as Liberty's attorney indicated, Liberty produced all the commercial invoices reflecting direct shipments from Hwa Meei, but was not able to produce the actual purchase orders of those shipments because Liberty used the same purchase order template and wrote over prior purchase orders with subsequent orders. *See* Dkt. No. 107 at 10.  At some point thereafter, Liberty's IT specialists were able to retrieve the e-mails transmitting scanned versions of most of the actual purchase orders, but were not able to reproduce ten purchase orders. *See id.*  As such, the Court finds that there may be no way to definitively determine the quantities of the products that Liberty purchased directly from

Hwa Meei. Although Liberty argues that it has the commercial invoices which demonstrate Halo's actual damages, the Court is not willing to grant Liberty summary judgment based on Liberty's own internal commercial invoices. Liberty also argues that the Court will be able to determine the quantity of the products at trial, but again, without the purchase orders, it may be that the Court is completely unable to determine the quantity of the products that Liberty purchased directly from Hwa Meei. As courts have noted, "[a]ny doubts regarding the amount of damages must be resolved against the infringer." *Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 262 (E.D.N.Y. 2008) (citing *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983)).

Since Halo has raised genuine issues of fact regarding whether its actual damages can be readily calculated, the Court finds that it is inappropriate at this stage to dismiss Halo's claims for enhanced damages under the Lanham Act. An award of enhanced damages may be appropriate in this case to fully compensate Halo for its actual losses. Accordingly, Liberty's motion for partial summary judgment seeking dismissal of Halo's claims for enhanced damages under the Lanham Act is denied.

### 2. Halo's New York General Business Law Claims

N.Y. G.B.L. § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York State]." N.Y. Gen. Bus. § 349. N.Y. G.B.L. § 350 prohibits "[f]alse advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in [New York State]." *Id.* § 350. To prevail on a claim under N.Y. G.B.L. § 349, a plaintiff must establish "first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d

24, 29 (2000) (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (1995)).  "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." *New World Solutions, Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 330 (S.D.N.Y. 2015) (quoting *Goshen v. Mutual Life Ins. Co. of New York*, 98 N.Y.2d 314, 324 n.1 (2002)).

"Although the [N.Y. G.B.L.] is, at its core, a consumer protection device, *see Genesco Entertainment v. Koch*, 593 F. Supp. 743, 751 (S.D.N.Y. 1984), 'corporate competitors now have standing to bring a claim under this [statute] . . . so long as some harm to the public at large is at issue.'" *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) (quoting *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 786 F. Supp. 182, 215 (E.D.N.Y. 1992)), *vacated in part on other grounds*, 973 F.2d 1033 (2d Cir. 1992).  For a corporate competitor to successfully bring a claim under the N.Y. G.B.L., "[i]t is clear that 'the gravamen of the complaint must be consumer injury or harm to the public interest.'" *Id.* (quoting *Azby Brokerage, Inc. v. Allstate Ins. Co.*, 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988)).  "Courts have consistently held that unique private transactions between sophisticated business parties do not give rise to liability under the statute." *Spin Master Ltd. v. Bureau Veritas Consumer Products Services, Inc.*, No. 08-CV-923, 2011 WL 1549456, *3 (W.D.N.Y. Mar. 7, 2011), *report and recommendation adopted*, No. 08-CV-923A, 2011 WL 1542038 (W.D.N.Y. Apr. 22, 2011).  Moreover, "for a trademark claim to be cognizable under these provisions, there must be some 'specific and substantial injury to the public interest over and above the ordinary trademark infringement [*i.e.*, general consumer confusion].'" *Sofa Doctor, Inc. v. New York Couch Doctor, Inc.*, No. 14-CV-05496, 2016 WL 951523, *3 (E.D.N.Y. Mar. 9, 2016) (quoting *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 305 (E.D.N.Y. 2014)) (other citation omitted).

Halo's complaint is almost entirely focused on damages to Halo's business, and not to the consuming public at large. *See generally* Dkt. No. 1. Halo brought three breach of contract claims, a federal trademark infringement claim, and a federal unfair competition claim, and most of the allegations in the complaint pertain to these causes of action. The crux of Halo's claims is that Liberty breached several contracts and infringed Halo's trademark by directly ordering REC SPECS products from Hwa Meei, by selling sports protective eyewear that competes with REC SPECS, and by blurring the distinction between REC SPECS and non-REC SPECS protective glasses. *See id.* ¶¶ 36-43. As such, the core harm alleged in the complaint is to Halo's business interests and not to the public at large. Moreover, to the extent that Halo argues that the public is harmed because of the trademark infringement itself, "courts in this Circuit 'have routinely dismissed trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes, because ordinary trademark disputes do not "pose a significant risk of harm to the public health or interest" and are therefore not the type of deceptive conduct that the statutes were designed to address.'" *Sofa Doctor*, 2016 WL 951523, at *3 (quoting *Kaplan, Inc. v. Yun*, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014)).

In an attempt to survive the instant motion for partial summary judgment, Halo argues that this dispute concerns the public at large because Halo was no longer able to inspect the products that Liberty purchased directly from Hwa Meei. *See* Dkt. No. 109-3 at 10-11. Since the products in question involve sports protective eyewear that consumers wear to protect their eyes in sporting events, and since both parties have had problems with Hwa Meei's quality control at times, Halo claims that this matter affects the public interest. *Id.* at 11. Halo argues that Liberty's purported suspension of ordering extra products for random destructive testing raises safety concerns that affect the public at large. *See* Dkt. No. 48-1 ¶¶ 6-9; Dkt. No. 109-5 at 2. The Court

is not convinced by this argument. Carmine DiChiara, Liberty's vice president, submitted a declaration explaining that although Halo performed destructive testing, Halo never once notified Liberty of a product already in production failing the impact tests. *See* Dkt. No. 114-2 ¶ 31. Liberty's failure to order extra products for destructive testing is simply not the kind of public harm that gives rise to liability under N.Y. G.B.L. §§ 349 and 350. Likewise, Halo argues that, after Halo commenced the instant action, one of Hwa Meei's test results documented a failure of an ASTM 803 test. *See* Dkt. No. 75-16 at 6-9. Mr. DiChiara contends that for that failed test, Hwa Meei used a new testing head that was not anatomically correct, and that was the reason for the failure. *See* Dkt. No. 114-2 ¶ 30. Mr. DiChiara submitted e-mail correspondence between Liberty and the ASTM committee members supporting Mr. DiChiara's contention that the new testing head was not anatomically correct. *See* Dkt. No. 114-9 at 2. In sum, there is no evidence in the record that the dispute between the parties concerns the public interest at large. Accordingly, Halo has failed to demonstrate a specific and substantial injury to the public interest above and beyond the trademark infringement itself.

Moreover, the mere fact that the product in question may implicate safety concerns does not establish a specific and substantial injury such that Halo's claims should survive. In *Mobileye, Inc. v. Picitup Corp.*, the plaintiff created a mobile app which warns drivers when they are drifting out of their lane and about to collide with an object. *Mobileye*, 928 F. Supp. 2d 759, 764 (S.D.N.Y. 2013). The defendant created a similar app, and the plaintiff argued that the defendant misled the public about whether the app complied with government and industry safety standards, thus raising safety concerns to the public at large. *See id.* at 783. The court concluded that "[a]lthough [plaintiff's] argument is not without some superficial appeal," the claims should be dismissed because the plaintiff pointed to no evidence that the app is actually dangerous or

unsafe. *See id.*

Halo relies on *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995) to support its claim that this case concerns the public interest. However, *Securitron* is distinguishable from the present case. In *Securitron*, the plaintiff electromagnetic lock manufacturer brought suit because the defendant gave false and misleading information regarding the plaintiff's products to a regulatory agency concerned with the safety of the public. *Securitron*, 65 F.3d at 264. The Second Circuit found that the harm to the public in that case was "manifest" since the defendant "caused the [agency] to undertake unnecessary investigations and interfered with its decisionmaking process by complaining of non-existent 'potential danger . . . in fire situations.'" *Id.* Although that case concerned a private commercial dispute, it clearly had an impact on the public interest, and the defendant even conceded that the public may have been incidentally affected. *Id.* Here, this is merely a commercial dispute between two private companies, and the public interest concerns that were present in *Securitron* are wholly absent from this case.

In sum, the core harm that Halo alleges is merely harm to Halo's business interests. Halo has also failed to demonstrate any "specific and substantial injury" to the public interest over and above the trademark infringement itself. Accordingly, Liberty's motion for partial summary judgment seeking dismissal of Halo's claims under N.Y. G.B.L. sections 349 and 350 is granted.

### 3. Other Damages

As part of Liberty's motion for partial summary judgment dismissing Halo's claims under the N.Y. G.B.L., Liberty also moved for dismissal of Halo's claim for punitive damages and for dismissal of Halo's claims for damages in relation to its N.Y. G.B.L. § 360-l claim. *See* Dkt. No. 103-5 at 12-14.

With respect to Liberty's motion to dismiss Halo's claim for punitive damages, Halo makes no argument in response as to why it is entitled to punitive damages, or which of its claims permit an award of punitive damages  *See* Dkt. No. 109-3.  Moreover, in Halo's motion for summary judgment, Halo does not argue that punitive damages are appropriate on any of its claims.  Halo merely requests that the Court "grant[] Halo such other and further relief, including treble and punitive damages, as the Court finds just and proper."  Dkt. No. 112-13 at 28.  Since Liberty specifically set forth why Halo should not be entitled to punitive damages and Halo did not retort Liberty's argument, Liberty's motion for summary judgment dismissing Halo's claim for punitive damages is granted.

With respect to Halo's claim under N.Y. G.B.L. § 360-l, Liberty argues that damages are not recoverable under that statute, as the statute permits only injunctive relief.  *See* Dkt. No. 103-5 at 13.  Halo makes no argument to the contrary.  The statute states as follows:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. G.B.L. § 360-l.  Courts have held that money damages are not permitted under this statute. *See, e.g.*, *Scholastic, Inc. v. Stouffer*, 124 F. Supp. 2d 836, 848 (S.D.N.Y. 2000).  Although it is not entirely clear whether Halo is even seeking damages pursuant to its N.Y. G.B.L. § 360-l claim, to the extent that Halo is seeking such damages, Liberty's motion for summary judgment dismissing Halo's claim for damages under N.Y. G.B.L. § 360-l is granted.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Liberty's motion for partial summary judgment (Dkt. No. 103) is **GRANTED** in part and **DENIED** in part as stated herein;[6] and the Court further

**ORDERS** that Halo's motion for summary judgment (Dkt. No. 112) is **GRANTED** in part and **DENIED** in part as stated herein;[7] and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: March 22, 2017
      Albany, New York

Mae A. D'Agostino
U.S. District Judge

---

[6] Liberty's motion seeking dismissal of Halo's claims under N.Y. G.B.L. sections 349 and 350, as well as Liberty's motion seeking dismissal of Halo's claim for punitive damages and damages under N.Y. G.B.L. section 360-l, are granted, while Liberty's motion seeking dismissal of Halo's claims for enhanced damages under the Lanham Act is denied.

[7] Halo's motion for summary judgement is granted as to liability on its breach of contract and trademark infringement claims, but denied as to damages on those claims. Halo's motion for summary judgment on its N.Y. G.B.L. claims, as well as Halo's motion seeking attorney's fees, are denied. Halo's motion seeking dismissal of Liberty's counterclaims is granted.