**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK**
_____

**HALO OPTICAL PRODUCTS, INC.; and
HALO SPORTS AND SAFETY, INC.,**

                      **Plaintiffs/Counter Defendants,**

    vs.                                      **6:14-cv-00282
                                            (MAD/TWD)**

**LIBERTY SPORT, INC.,** _formerly known as_
**LIBERTY OPTICAL MANUFACTURING
COMPANY, INC.,**

                        **Defendant/Counter Claimant.**
_____

**APPEARANCES:**                                **OF COUNSEL:**

**MCNAMEE, LOCHNER LAW FIRM**          **G. KIMBALL WILLIAMS, ESQ.**
677 Broadway
Albany, New York 12207-2503
Attorneys for Plaintiffs/Counter Defendants

**WHEELER, TRIGG LAW FIRM**             **CAROLYN J. FAIRLESS, ESQ.**
370 Seventeenth Street                           **GWEN J. YOUNG, ESQ.**
Suite 4500
Denver, Colorado 80202
Attorneys for Defendant/Counter Claimant

**O'CONNELL, ARONOWITZ LAW FIRM**    **JEFFREY J. SHERRIN, ESQ.**
Albany Office
54 State Street, 9th Floor
Albany, New York 12207-2501
Attorneys for Defendant/Counter Claimant

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Plaintiffs Halo Optical Products, Inc. and Halo Sports and Safety, Inc. (collectively

"Halo") commenced this action on March 13, 2014, alleging trademark infringement and breach

of contract by Defendant Liberty Sport, Inc. ("Liberty"). *See* Dkt. No. 1. In a Memorandum-Decision and Order dated June 24, 2014 (the "June 24 Order"), the Court granted Halo's motion for a preliminary injunction. *See* Dkt. No. 34. On March 5, 2015, the Court denied Liberty's motion for reconsideration of the June 24 Order. *See* Dkt. No. 71. On February 22, 2016, the Court denied Liberty's motion for partial summary judgment. *See* Dkt. No. 102. On March 22, 2017, the Court granted in part and denied in part Halo's motion for summary judgment and another motion for partial summary judgment filed by Liberty. *See* Dkt. No. 127.

Currently before the Court is Liberty's motion to clarify, or in the alternative, modify, the preliminary injunction. *See* Dkt. Nos. 122, 123.

## II. BACKGROUND

The Court assumes the parties' familiarity with the background of this case, as detailed in the Court's previous orders. *See* Dkt. Nos. 34, 127. Accordingly, the Court will only discuss the relevant facts as they pertain to the pending motion.

As the Court explained in its Memorandum-Decision and Order dated March 22, 2017, at this point, the only agreements between the parties are the 1992 Distribution Agreement and the 1993 Trademark License Agreement. *See* Dkt. No. 127 at 15. The 1992 Distribution Agreement provides that "[e]ither party may terminate the agreement at anytime for any reason provided the terminating party give the other party twelve (12) months written notice of its desire to terminate." Dkt. No. 5-6 at 2. It then contains specific provisions applicable to this twelve-month period. *See id.* The 1993 Trademark License Agreement does not contain a termination provision. *See* Dkt. No. 5-7.

On March 11, 2016, Anthony M. DiChiara, Liberty's president and CEO, sent a letter to

Peter Leonardi,[1] Halo's president, providing Halo with notice of Liberty's intent to terminate the remaining agreements between the parties. *See* Dkt. No. 122-5. Mr. DiChiara informed that "[t]he effective date of termination of the agreements is the later of one year from the date of this notice or at such time after one year that Liberty notifies Halo that it has been able to substantially deplete its inventory of REC SPECS products, but in no event later than two years from the date of this notice." *Id.* at 2. Mr. DiChiara also provided that Liberty would continue to purchase products from Halo for the twelve-month period following this notice pursuant to the 1992 Distribution Agreement. *See id.*

On February 8, 2017, Mr. DiChiara sent a letter to Ann Anderson providing an update regarding Liberty's intent to terminate the remaining agreements. *See* Dkt. No. 122-6. Mr. DiChiara explained that Liberty would reach the point of substantially depleting its salable inventory on or about July 31, 2017, and, thus, effectively terminate the remaining agreements at that time. *See id.* at 2. On February 10, 2017, Halo's counsel responded by contacting Liberty's counsel and asking them if Liberty intends, after the purported termination of the remaining agreements, "to order, purchase, market or sell REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, other than in accordance with the parties' agreements, and the custom and practice implementing them," quoting the language of the preliminary injunction. *See* Dkt. No. 122-7 at 2 (emphasis omitted); *see also* Dkt. No. 34 at 31. According to Liberty, this was the first time that Halo responded to Liberty's notice of termination. *See* Dkt. No. 122 at 2.

Shortly thereafter, on February 28, 2017, Liberty filed the instant motion to clarify or modify the preliminary injunction pursuant to Fed. R. Civ. P. 65 and 60(b)(5). *See id.* at 1.

---

[1] Mr. Leonardi passed away on November 5, 2016. *See* Dkt. No. 121.

Liberty argues that upon termination of the remaining contracts, "Liberty will no longer market or sell products with the REC SPECS trademark, thereby relinquishing its exclusive license to use that mark, and instead will market and sell only sports protective eyewear that does not bear the REC SPECS trademark." Dkt. No. 122-1 at 5. Liberty contends that Halo's position is that the preliminary injunction prohibits Liberty from selling non-REC SPECS products, even after the agreements have terminated and after Liberty relinquishes its right to the REC SPECS mark. *See id.* Liberty argues that Halo's interpretation of the injunction is incorrect, or if it is correct, the injunction should be modified to reflect Liberty's ability to sell sports protective eyewear that competes with REC SPECS eyewear after the contracts are terminated and after Liberty ceases to promote and sell REC SPECS products. *See id.* at 6-7.

Liberty makes several other arguments in its motion. Liberty claims that, although the 1993 Trademark License Agreement does not contain an express termination provision, New York law implies one, and a contract can be terminated after a reasonable time and upon reasonable notice. *See id.* at 15. Liberty contends that it gave Halo reasonable notice of its intent to terminate the remaining agreements. *See id.* at 15-16. Once the agreements are terminated, Liberty argues that it can no longer be enjoined from selling competing eyewear. *See id.* at 17. Liberty further contends that either Liberty or Halo may use the parties' jointly owned patented technology without seeking permission from the other party. *See id.* at 18-20. Liberty attached to its motion patents owned by Carmine S. DiChiara and Peter Leonardi, which have been assigned to Liberty and Halo. *See* Dkt. Nos. 122-9, 122-10, 122-11, 122-12.

In Halo's opposition, Halo argues that Liberty's current motion is, in reality, a motion for summary judgment on counterclaims that Liberty failed to plead. *See* Dkt. No. 128 at 15-16. Halo contends that Liberty never pleaded a counterclaim seeking a judicial declaration of the

4

parties' rights in the event that Liberty would cease to fulfill its obligations under the 1993 Trademark License Agreement and begin to order sports protective eyewear directly from Halo's Taiwanese manufacturer. *See id.* at 16. Halo further contends that Liberty's motion is also, in reality, a sur-rebuttal to Halo's motion for summary judgment. *See id.* at 16-18. Halo claims that the focus of Liberty's motion is the legal effect and consequence of Liberty's intention to stop ordering sports protective eyewear through Halo, while continuing to market and sell identical products that Liberty currently purchases through Halo, but without the REC SPECS trademark. *See id.* at 17. Halo also asserts several arguments with respect to the parties' patent rights. Halo notes that Liberty never pleaded a counterclaim for a judicial declaration regarding the parties' rights and obligations under their jointly owned patents. *See id.* at 18. Halo further contends that the parties' "multiple written agreements render Liberty's patent law statutory and case law citations, all of which were expressly 'in the absence of an agreement to the contrary,' inapposite." *Id.* at 19.

In Liberty's reply, Liberty argues that its motion is exactly what it says it is—a motion to clarify or modify the scope of the preliminary injunction—which is now justified by changed circumstances. *See* Dkt. No. 129 at 6-8. Liberty claims that Halo never addressed the substantive arguments in Liberty's motion. *See id.* at 8-9. Liberty contends that Halo does not address Liberty's arguments with respect to the parties' patent rights, and that the parties only have two agreements regarding the patents, which give Liberty an equal an undivided interest in those patents. *See id.* at 10. Liberty further argues that Halo seemingly conflates the parties' patent rights with their trademark rights. *See id.* at 10-11. Finally, to the extent that Halo claims that any of the agreements with respect to the trademark govern the parties' patent rights, Liberty

5

argues that the agreements that specifically pertain to the patents control.[2] *See id.* at 11-12.

### III. DISCUSSION

Fed. R. Civ. P. 60(b)(5) provides that "the court may relieve a party . . . from a final judgment, order, or proceeding . . . [if] applying [the judgement] prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). "Although by its terms Rule 60(b)(5) concerns final orders, it has been interpreted to extend to modifications of preliminary injunctions." *Bd. of Governors of Fed. Reserve Sys. v. Pharaon*, 140 F.R.D. 642, 648 (S.D.N.Y. 1991) (citations omitted). The Second Circuit has provided the following guidance regarding modification of preliminary injunctions:

> While changes in fact or in law afford the clearest bases for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes.

*King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969) (citation omitted). "Although a court may properly exercise its equitable power to modify an injunction that has become inequitable, modification is not a proper remedy when a party to a consensual order is dissatisfied with the bargain that was reached." *Pharaon*, 140 F.R.D. at 648.

As previously mentioned, the only remaining agreements between the parties are the 1992 Distribution Agreement and the 1993 Trademark License Agreement. Although the 1993 Trademark License Agreement does not contain a termination provision, under New York law, the general rule is that a contract such as this can be terminated upon reasonable notice. *See Laugh Factory, Inc. v. Basciano*, 608 F. Supp. 2d 549, 556 (S.D.N.Y. 2009) (holding that, under

---

[2] The parties also assert several claims with respect to Liberty's right to inspect Halo's books and records. That is a completely separate issue from the pending motion currently before the Court, and the Court will not address any of those arguments at this time.

New York law, in the context of an oral trademark license, "a contract that does not contain a termination provision is terminable only upon reasonable notice.") (citing *Italian & French Wine Co. of Buffalo v. Negociants U.S.A., Inc.*, 842 F. Supp. 693, 699 (W.D.N.Y. 1993)) ("[W]ell-settled New York law . . . provides that a contract with no stated duration is terminable only after a reasonable duration and after reasonable notice is given.").

Here, Liberty provided Halo with written notice of its intent to terminate the remaining contracts on March 11, 2016. *See* Dkt. No. 122-5 at 2. Liberty explained that the effective termination date would be the later of one year from that notice or when Liberty notifies Halo that it has been able to substantially deplete its REC SPECS inventory. *See id.* Liberty then updated Halo approximately eleven months later, informing Halo that it would substantially deplete its inventory on or about July 31, 2017. *See* Dkt. No. 122-6 at 2. The Court finds that this notice was reasonable. Liberty provided Halo with a minimum of one year's notice to prepare for such termination, and before that one year had expired, Liberty updated Halo and gave Halo another five months' notice of its intent to terminate the agreements. Halo does not argue that this notice was unreasonable. Accordingly, Liberty's notice of intent to terminate was reasonable, and Liberty may terminate the agreements between the parties.[3]

In its Memorandum-Decision and Order dated February 22, 2016, the Court noted that the parties agreed that once Liberty ceases to promote and market REC SPECS eyewear, the 1993 Trademark License Agreement will terminate. *See* Dkt. No. 102 at 7 n.2. At that point, this

---

[3] The Court is unsure if Liberty actually stopped issuing purchase orders through Halo on or about March 11, 2017, as Liberty indicated it would do in its February 8, 2017 letter, but it appears from Liberty's counsel's statements during the recent telephone conference that Liberty had not done so. Although Liberty is free to terminate the parties' agreements and stop ordering products through Halo, Liberty obviously must act in good faith in depleting its inventory and terminating the agreements.

7

discussion regarding terminating the agreements was merely hypothetical because Liberty had not provided Halo with any notice of termination.  However, now Liberty has provided Halo with reasonable notice of termination, and Liberty seeks to terminate the remaining agreements and relinquish its right to use the REC SPECS mark.  Liberty is entitled to do so.  Halo's opposition to the current motion is curious—it appears that Halo's position is that Liberty can never terminate the remaining agreements between the parties, and cannot sell or market sports protective eyewear that competes with REC SPECS eyewear even after Liberty relinquishes its right to the REC SPECS mark.  However, Halo provides nothing to support this position, and as the Court has explained, New York law provides that a contract may be terminated upon reasonable notice. *See Laugh Factory*, 608 F. Supp. 2d at 556.  Accordingly, Liberty is free to terminate the agreements and relinquish its right to use the REC SPECS mark.  To the extent that this Court has ever held otherwise in its previous orders, the discussion of Liberty's termination of the agreements up until this point was merely hypothetical, and the Court did not want to modify the injunction based on a hypothetical set of facts.

Once the remaining contracts are completely terminated, there appears to be some dispute between the parties as to their respective rights.  At the outset, the Court stresses the fact that this is not a patent infringement case, and the Court will not make any specific rulings with respect to the parties' patents.  However, since there seems to be some outstanding questions regarding the parties' rights under the patents as a result of this litigation, and specifically as a result of the contracts in dispute during this litigation, the Court will clarify the parties' respective rights as far as this litigation is concerned.

35 U.S.C. § 262 provides that, "[i]n the absence of any agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the

United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." 35 U.S.C. § 262; *see also Canon Inc. v. Tesseron Ltd.*, 146 F. Supp. 3d 568, 575 (S.D.N.Y. 2015) ("[E]ach co-owner 'is ordinarily free' to sell a patented invention without regard to the wishes of any other co-owner and to license others to do so."). Liberty contends that it has sold several models of REC SPECS branded eyewear covered by two issued patents. *See* Dkt. No. 122-1 at 11. Liberty also provided the Court with two assignment agreements which assigned those patents to Liberty and Halo. *See* Dkt. Nos. 122-11, 122-12.

Halo appears to argue that the contracts that this Court has reviewed with respect to the parties' trademark rights have, at least to some extent, a legal effect on the parties' patent rights.[4] *See* Dkt. No. 128 at 18-19. Halo does not identify any specific contractual provision that it is referring to. The Court first notes that "[t]he underlying purpose and the essence of patent rights are separate and distinct from those appertaining to trademarks." 1 McCarthy on Trademarks and Unfair Competition § 6:8 (4th ed.). Moreover, all of the agreements except for the 2006 Memorandum of Understanding predate the agreements with respect to the patents. *See* Dkt. No. 122-11 at 5; Dkt. No. 122-12 at 5. It is not clear that any language in the contracts that the Court has reviewed pertains to the parties' patents or designs, but to the extent that any language does pertain to such designs, the language in the assignment agreement is controlling. *See GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204, 214 (2d Cir. 2010) ("[S]pecific language in a contract will prevail over general language where there is an inconsistency between two provisions.") (quotation omitted); *DeWitt v. DeWitt*, 62 A.D.3d 744, 745 (2d Dep't 2009)

---

[4] The contracts that the Court is referring to are the 1992 Distribution agreement, *see* Dkt. No. 5-6, the 1993 Trademark License Agreement, *see* Dkt. No. 5-7, the 2002 Outline of Understanding, *see* Dkt. No. 5-9, the 2003 Licensing Agreement, *see* Dkt. No. 5-8, and the 2006 Memorandum of Understanding, *see* Dkt. No. 5-10.

("Where there is an inconsistency between a specific provision and a general provision of a contract, the specific provision controls.") (quotation omitted); *see also Medtech Prod. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 809 (S.D.N.Y. 2008) ("[U]nder New York law, a subsequent contract regarding the same subject matter supersedes the prior contract even where there is no integration and merger clause in the subsequent contract.") (quotation omitted).

With that said, the Court is not making any rulings with respect to the patent assignment agreements or any technology that is covered by those agreements. The Court is merely stating that nothing in the agreements pertaining to the trademark that are before the Court prohibits Liberty from using its jointly patented technology. This is a trademark infringement case, and as long as Liberty relinquishes its right the REC SPECS mark, it is free to use its patented technology with any other mark that it is legally entitled to use. If Halo believes that Liberty is acting in violation of the parties' patent agreements, or otherwise infringing upon a patent owned by Halo, Halo is of course free to bring a patent infringement suit, but that is not the concern of this litigation. As far as this litigation is concerned, as soon as all the contracts are terminated, Liberty is free to market and sell sports protective eyewear that competes with REC SPECS eyewear, but by doing so, Liberty will completely relinquish its right to the REC SPECS mark.

Halo's remaining arguments are unpersuasive. Halo argues that Liberty is essentially trying to terminate its obligations under the 1993 Trademark License Agreement, but keep in place its right under that agreement to purchase Halo upon Mr. Leonardi's death. *See* Dkt. No. 128 at 4, 17. However, the 1993 Trademark License Agreement explicitly gives Liberty the right to purchase Halo upon Mr. Leonardi's death. *See* Dkt. No. 5-7 at 3-4. When Mr. Leonardi died on November 5, 2016, the 1993 Trademark License Agreement was still in effect and binding on the parties. At that point, Liberty's right to purchase Halo triggered. Merely because Liberty was

planning on terminating the agreements does not mean that the remaining provisions in the agreements were somehow already terminated, and Halo does not provide any legal argument as to why that would be the case.[5]

Moreover, Halo's argument that Liberty failed to plead various counterclaims is unavailing. Liberty did not have to plead a counterclaim with respect to its rights under the patents in this trademark litigation, and the Court is not making any specific findings with respect to the patents. Similarly, Liberty did not need to plead a counterclaim seeking a declaratory judgment of the parties' rights if Liberty ceased to fully implement the 1993 Trademark License Agreement. In fact, Liberty's doing so gave rise to this case, and the Court has already ruled that Liberty breached the contracts and owes Halo money damages. However, Liberty is entitled to terminate the contracts, and Liberty did not need to plead a counterclaim for a declaratory judgment in the event that Liberty may later seek to terminate the parties' remaining agreements. The Court also rejects Halo's argument that Liberty's motion is an attempted sur-rebuttal to Halo's motion for summary judgment.

In sum, Liberty is free to terminate the remaining agreements between the parties. Once Liberty does so, as far as this litigation is concerned, Liberty may market and sell sports protective eyewear that competes with REC SPECS eyewear, as long as Liberty complies with the injunction in this case and does not infringe upon Halo's REC SPECS mark. The language in the injunction currently provides as follows:

> Liberty is hereby **ENJOINED** during the pendency of this action from (1) ordering, purchasing, marketing or selling REC SPECS eyewear, or sports protective eyewear that competes with REC

---

[5] Again, the Court is not making any ruling with respect to Liberty's right to inspect Halo's books and records, but merely noting that the 1993 Trademark License Agreement gives Liberty the right to purchase Halo upon Mr. Leonardi's death.

11

> SPECS eyewear, **or** (2) if Liberty does order, purchase, market or
> sell REC SPECS eyewear, or sports protective eyewear that
> competes with REC SPECS eyewear, that it do so in accordance
> with the parties' agreements, and the custom and practice
> implementing them as discussed herein.

Dkt. No. 34 at 31. It is true that this injunction does not squarely contemplate a situation in which Liberty terminates all of the remaining agreements and relinquishes its right to the REC SPECS mark. As mentioned, the Court recognized in its February 22, 2016 Memorandum-Decision and Order that the 1993 Trademark License Agreement will terminate when Liberty ceases to aggressively market REC SPECS products. *See* Dkt. No. 102 at 7 n.2. The Court acknowledges that it did not grant Liberty's motion for reconsideration to modify the injunction in its Memorandum-Decision and Order dated March 5, 2015, but, again, that request was based on a completely hypothetical set of facts. Circumstances have changed, and Liberty has provided Halo with adequate notice of its intent to terminate the remaining agreements and relinquish its right to the REC SPECS mark. Accordingly, Liberty's motion to modify or clarify the injunction is granted, and the Court will modify the injunction in a way that explicitly allows Liberty to sell and market sports protective eyewear that competes with REC SPECS eyewear as long as Liberty terminates the remaining agreements and relinquishes its right to the REC SPECS mark.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Liberty's motion to clarify or modify the preliminary injunction (Dkt. No. 122) is **GRANTED**; and the Court further

**ORDERS** that as long as the parties' agreements pertaining to the trademark remain in effect, Liberty is **ENJOINED** during the pendency of this action from ordering, purchasing,

marketing or selling REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, **or** (2) if Liberty does order, purchase, market or sell REC SPECS eyewear, or sports protective eyewear that competes with REC SPECS eyewear, that it do so in accordance with the parties' agreements, and the custom and practice implementing them as discussed in the Court's previous orders; and the Court further

**ORDERS** that if the parties' agreements are effectively terminated and Liberty relinquishes its right to use the REC SPECS trademark, Liberty is **ENJOINED** during the pendency of this action from ordering, purchasing, marketing or selling eyewear bearing the REC SPECS trademark; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 11, 2017
       Albany, New York

Mae A. D'Agostino
U.S. District Judge